IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | | |
|---|---|---|
| NAEEM M. ABDURRAHMAN, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| THE UNIVERSITY OF TEXAS, | § | CIVIL ACTION NO. A 00 CA 813 JN |
| DALE E. KLEIN, | § | |
| LARRY R. FAULKNER, | § | |
| SHELDON EKLAND-OLSON, | § | |
| BEN G. STREETMAN, | § | |
| NEAL E. ARMSTRONG, | § | |
| SHELDON LANDSBERGER and | § | |
| J. PARKER LAMB, | § | |
| *Defendants.* | § | |

FILED

OCT 2 9 2001

CLERK U.S. DISTRICT COURT
BY _____ Deputy

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**



RECEIVED

OCT 2 2001

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

31

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     Plaintiff Has Failed To State A Cause Of Action
       For Retaliation Under The First Amendment          . . . . . . . . . . . . . . . . . . . . . . . . . 14

       A.     Plaintiff's "Speech" was Unprotected by the First Amendment
              Because it Did Not Address a Matter of Public Concern  . . . . . . . . . . . . . . . . 14

       B.     Plaintiff Cannot Show That His Speech was a Substantial or
              Motivating Factor in the Tenure Decision, Because None
              of the Decision Makers was Aware of Plaintiff's "Speech"  . . . . . . . . . . . . . . 17

II.    Plaintiff Has Failed To State A Claim Under 42 U.S.C. § 1981 . . . . . . . . . . . . . . . . 18

III.   Even Assuming, *Arguendo*, That Plaintiff Has Stated A Claim Under
       Either The First Amendment Or § 1981, Each Of The Individual Defendants
       Is Entitled To Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       A.     Each Of The Individual Defendants Is Entitled To Qualified Immunity
              With Respect To Plaintiff's First Amendment Retaliation Claim
              Because The Law Was Not Clearly Established That Plaintiff's
              Speech was Protected  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       B.     Each Of The Defendants Is Entitled To Qualified Immunity
              With Respect To Plaintiff's Discrimination Claim Under § 1981  . . . . . . . . . . 23

       C.     The Individual Defendants did not Violate Clearly Established First Amendment
              or  § 1981 Rights of which a Reasonable Person would have Known, Because
              Their Actions Were Objectively Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.  Plaintiff Cannot Prevail On A Claim Under Title VI . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Creighton*, 483 U.S. 635 (1987) ........................................................ 21, 24

*Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir.1998) .................................... 22

*Butz v. Economou*, 438 U.S. 478 (1978) ................................................................. 20

*Celotex Corporation v. Catrett*, 477 U.S. 317 (1986) ................................................ 13

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................................. 14

*Davis v. Scherer*, 468 U.S. 183 (1984) ................................................................... 21

*Doe v. Louisiana*, 2 F.3d 1412 (5th Cir. 1993) ........................................................ 24

*Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995) .......................................................... 24

*Elder v. Holloway*, 510 U.S. 510 (1994) ................................................................ 20

*Gerhart v. Hayes*, 217 F.3d 320 (5th Cir. 2000) .................................................. 14, 18

*Gillum v. City of Kerrville*, 3 F.3d 117 (5th Cir.1993) ............................................... 22

*Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290 (11th Cir. 1998) ................ 23

*Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261 (5th Cir. 1994) ........................ 18

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................. 20

*Kennedy v. Tangipahoa Parish Library Board of Control*,
224 F.3d 359 (5th Cir.), reh. and reh en banc den'd 239 F.3d 367 (2000) ................ 16, 22

*Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995), <u>cert. denied</u>, 519 U.S. 947 (1996) .............. 40, 41

*Lassiter v. Alabama A.&M. University*, 28 F.3d 1146 (11th Cir. 1994) .......................... 21

*Lawrence v. University of Texas Medical Branch*, 163 F.3d 309 (5th Cir. 1999) .............. 19

*Lowery v. Texas A & M University System*, 117 F.3d 242 (5th Cir. 1997) ................... 40, 41

*Mato v. Baldauf*, No. 00-50522, 2001 WL 1117321 (5th Cir. Oct. 9, 2001) ................. 18

*Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ....................................................... 14, 17

*Pierce v. Smith*, 117 F.3d 866 (5th Cir. 1997) ....................................................... 21, 24

*Price v. Digital Equipment Corp.*, 846 F.2d 1026 (5th Cir. 1988) ............................................... 18

*Siegert v. Gilley*, 500 U.S. 226 (1991), reh. den'd U.S. 65 ....................................................... 22

*Thompson v. Upshur County, Texas*, 245 F.3d 447 (5th Cir. 2001) ........................................... 21

## STATUTES

42 U.S.C. § 1983 ....................................................................................................... 14

42 U.S.C. § 1981 ................................................................................................ passim 37

42 U.S.C. § 2000e et seq ........................................................................................... 40

42 U.S.C. § 2000d ..................................................................................................... 41

# EXHIBITS

A.    Grievance of Naeem Abdurrahman, dated January 31, 2000

B.    Excerpts from Transcript of Grievance Hearing (3 volumes)

C.    Final Report of the Grievance Panel

D.    Resume of Naeem M. Abdurrahman, Ph.D

E.    Resume of Bernard Wehring, Ph.D

F.    Candidate's Statement of Honors and Awards

G.    Affidavit of Bill Harris, Director, Amarillo National Resource Center

H.    Deposition of Dr. Naeem Abdurrahman

I.    E-mail, dated January 30, 1997, from "naeem" to David Watson

J.    Series of e-mails, dated January 30 and January 31, 1997.

K.    Letter, dated December 18, 1996, from J. Parker Lamb, Chair, Mechanical Engineering
      Department to Professor Sheldon Landesberger

L.    Letter, dated December 17, 1996, from J. Parker Lamb, Chair, to Professor Sheldon
      Landsberger

M.    March 20, 1997 Progress Report by Sheldon Landsberger

N.    Summaries published in the Transactions of the American Nuclear Society

O.    American Nuclear Society Publications – Information for Authors

P.    American Nuclear Society Survey 2001

Q.    E-mail, dated June 18, 1997 from J. Lamb to Naeem Abdurrahman

R.    Letter, dated October 31, 1997, from Sheldon Landsberger to Professor Roy Axford

S.    Letters received late 1997 and early by Sheldon Landsberger from Professors Larsen,
      Turinsky, Axford, and Dorning

T.    Memorandum, dated May 1, 1998, from President Faulkner to Deans and Department
      Chairs

iv

U.   E-mail memorandum, dated January 16, 1998, from J. Parker Lamb to Dr. Abdurrahman, Sheldon Landsberger, and Berhard Wehring

V.   Guidelines for the Preparation of Supporting Materials and the Management of Tenured and Tenure-Track Candidate Files, dated Fall 1998

W.   Memorandum, dated May 15, 1998, from Sheldon Landsberger to Parker Lamb.

X.   Identification of Referees

Y.   Letters of Reference

Z.   Budget Council Statements

AA.  Recommendation for Change in Academic Rank/Status

BB.  Statement of the Department Chair

CC.  Dean's Assessment

DD.  Affidavit of Larry R. Faulkner

EE.  Affidavit of Neal E. Armstrong

FF.  Affidavit of Sheldon Ekland-Olson

GG.  Affidavit of Ben G. Streetman

HH.  Affidavit of Sheri Biggs

II.  Set of memoranda and e-mails regarding "Start-up Funds"

JJ.  Correspondence between the ANRC and Drs. Adams and Nelson

KK.  Affidavit of Carl Beard

LL.  Letter, dated July 13, 1998, from Ted Belytschko to Mohammed Elsawi, and July 22, 1998, response from Mohammed Elsawi to Professor Ted Belytschko

| | | |
|---|---|---|
| NAEEM M. ABDURRAHMAN,<br>*Plaintiff,* | §<br>§<br>§ | |
| *v.* | §<br>§ | |
| THE UNIVERSITY OF TEXAS,<br>DALE E. KLEIN,<br>LARRY R. FAULKNER,<br>SHELDON EKLAND-OLSON,<br>BEN G. STREETMAN,<br>NEAL E. ARMSTRONG,<br>SHELDON LANDSBERGER and<br>J. PARKER LAMB,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. A 00 CA 813 JN |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule CV-7 of the Local

Rules of this Court, and this Court's Order Granting Joint Motion to Extend Deadlines, dated

August 1, 2001, Defendants University of Texas, Dale E. Klein, Larry R. Faulkner, Sheldon

Ekland-Olson, Ben G. Streetman, Neal E. Armstrong, Sheldon Landsberger and J. Parker Lamb,

(hereinafter collectively referred to as "Defendants"), by and through their counsel, hereby move

for summary judgment, in the above-entitled and numbered cause.

### INTRODUCTION

This case arises out of the decision of the University of Texas (UT) not to grant tenure to

Naeem Abdurrahman, Ph.D, an assistant professor in the nuclear engineering program of the UT

Mechanical Engineering Department (ME), in December 1998. Although Dr. Abdurrahman

failed to follow the first rule of academia, "publish or perish," was routinely rated by seniors

graduating from ME as among the worst three professors they had during their four years in school, and was voted down 24 to 4 by the faculty members of the ME Department who voted on his tenure application, Dr. Abdurahhman chooses to attribute his lack of success to discrimination based upon his Arab descent and/or retaliation against him for having sent one e-mail, approximately three years before the tenure vote, which complained about a delay in his receipt of grant funds from the Amarillo National Resource Center, a consortium of three universities, including UT, that receives federal funds and is run by a board of directors chaired by the Vice Chancellor of UT (who played no role in the tenure decision).

Plaintiff exercised his right to pursue a grievance regarding his tenure denial in which he raised essentially the same issues raised in the instant Complaint. Exhibit A. After a three day hearing (Exhibit B), the grievance panel denied the grievance. Exhibit C. Of note, although plaintiff called two faculty members as witnesses, both of them testified that he was not qualified for tenure. Discovery has now concluded, and there remains no evidence whatsoever that the denial of plaintiff's tenure application resulted from any but legitimate considerations. Summary judgment for defendant is, therefore, appropriate.

The individual defendants are: Larry Faulkner, President of UT, Dale Klein, Vice Chancellor, Sheldon Eckland-Olson, Provost, Ben G. Streetman, Dean of the College of Engineering, Neal E. Armstrong, Associate Dean for Academic Affairs, J. Parker Lamb, former Chair of ME (now retired), and Professor Sheldon Landsberger. Plaintiff's complaint alleges two causes of action against each of these individual defendants: (1) retaliation against him for engaging in speech protected by the First Amendment, and (2) discrimination against him on the basis of his race (Arab) in contravention of 42 U.S. C. § 1981. His sole claim against defendant

University of Texas ostensibly arises under Title VI of the Civil Rights Act of 1964 (as amended). As he cannot prove essential elements of each of these claims, and, in addition, individual defendants Klein, Landsberger, Lamb, Faulkner, Armstrong, and Eckland-Olson are each entitled to qualified immunity, defendants are entitled to summary judgment.

## STATEMENT OF FACTS

Plaintiff Naeem Abdurrahman was born in Libya, but is a naturalized U.S. citizen. He received a Ph.D in nuclear engineering from Rensselaer Polytechnic Institute in 1993 and joined the faculty at UT in the fall of 1993 as a tenure track Assistant Professor in the nuclear engineering program within ME. Exhibit D. At that time, ME comprised six different technical areas, of which the nuclear group was the smallest, consisting of only three tenured faculty: Defendant Dale Klein, Berhard Wehring, and Billy Koen.[1] Exhibit B at 523. Dr. Wehring served as both Area Coordinator and Director of UT's Nuclear Engineering Teaching Laboratory (NETL), located at the J.J. Pickle Research Campus.[2]

The E-mail Comprising Plaintiff's First Amendment Retaliation Claim

During his years as an assistant professor at UT, Dr. Abdurrahman received the great

---

[1] Dr. Klein has been with UT since 1977 and is presently the UT-System Vice Chancellor for Special Engineering Programs. Exhibit B at 202-03. On October 17, 2001, the White House announced his nomination to be Assistant Secretary of Defense for Nuclear, Chemical and Biological Defense Programs. Dr. Wehring came to UT in 1989 after serving 18 years on the faculty of the University of Illinois and five years at North Carolina State University. Exhibit E. Dr. Koen has been on the UT faculty for 32 years, but has been only "peripherally related" to the nuclear group for a number of years and no longer conducts nuclear research. Exhibit B at 27, 554, 599.

[2] The Pickle Research Campus is located approximately nine miles from the main UT campus. The NETL, a building on that campus, houses a functioning nuclear reactor licensed by the Nuclear Regulatory Commission. As a result, it is required to maintain a professional staff, including licensed operators, to run the reactor. Exhibit B at 204.

majority of his research funding from the Amarillo National Resource Center (ANRC).  Exhibit

F at 2-3.[3]  The ANRC is a consortium of The Texas A&M University System, Texas Tech

University, and the UT System, and only faculty members from those three entities are allowed

to compete for ANRC funds.  Exhibit H at 17-18.[4]  Six months to a year can elapse from the time

a researcher submits a letter of intent until a grant (if approved) is funded.  Proposals are often

funded at a rate lower than that requested by the faculty member for any number of reasons,

including "peer reviews, funding limitations, Governing Board decisions" or changes by DOE in

its research priorities.  Similarly, funds are sometimes not distributed to faculty researchers in a

timely manner due, for example, to a corresponding delay by DOE in releasing the funds.

Exhibit G at par. 4.

On January 30, 1997, plaintiff received an inquiry from David Watson, an employee of

the ANRC,  regarding Dr. Abdurrahman's  portion of a research project being conducted jointly

by UT and by researchers from Texas A&M.  Exhibit I.  Mr. Watson noted that although the

spreadsheet provided by Dr. Marvin Adams, a faculty member at A&M and the lead investigator

for the project, indicated that plaintiff's portion of the project was being funded at $141,500, the

"budget" sheet ANRC had for this portion reflected the funding at $170,508.   Dr. Abdurrahman

---

[3]  The ANRC  was founded in 1994 to conduct scientific and technical research and provides
information on nuclear weapons materials and related environment, safety, health, and nonproliferation
issues.  Exhibit G at par. 3.  It was created as a result of a proposal submitted by Dr. Klein to the
Department of Energy (DOE) in 1993, in response to DOE's decision to consolidate all nuclear weapons
production/dismantlement in one facility, located in Amarillo, Texas.  Exhibit B at 208-09.  Pursuant to
the agreement, DOE would provide $49 million over a five year period.

[4]  Grants are awarded in response to solicitations by the ANRC for letters of intent.  A subset of
respondents is then asked to submit full proposals, which are then reviewed by ANRC administration,
which makes recommendations to the ANRC Board of Directors.

replied via e-mail that the $170,508 figure was correct. Exhibit I.

Later that day, plaintiff received an e-mail from Dr. Adams.[5]  Exhibit J, p. 2.  Dr. Adams indicated that he had seen plaintiff's e-mail to David Watson and explained:

> that "[t]he source of the confusion seems to be that *you are still using numbers from our discussions in September, whereas in November ANRCP directed us to trim our total budget by another 24%,* from $1.043M to $800k. I told everyone about this in an email Nov. 9 (the day after ANRCP told me), and I sent my suggestions for how the project could absorb the cuts. Later, on Jan 6, I sent final budget numbers based on all feedback I'd received from everyone. . . .
> \*        \*        \*        \*
> . . . I realize that it is extremely difficult to work with ANRCP given their lack of commitment to stable funding – I'm in the same boat, obviously.

Exhibit J at p. 2 (emphasis added).  Responding to Dr. Adams still later on January 30th, plaintiff noted that he had not seen the e-mail of January 6  "until today." Exhibit J at p. 1.[6]  He added:

> I think the Center is to be blamed for this confusion, and if there should be any remedial action, it should come from the Center. . . . I don't have any suggestion for a solution except that the Center may consider picking up the discrepancy in the two figures. I would like to use this opportunity to relate to the decision makers in the Center that we can't keep modifying budgetary decisions till (sic) the last minute. It takes some time to recruit students and other personnel to work on a particular project, and offers have to go out within some reasonable time before the start date of a given project. Some planning need (sic) to be done. One can't just pick any student from the hallway one week before the semester starts and hope to be able to deliver any useful work. As you can see, I am copying several Center leaders and decision makers with this message. I hope it's not too politically incorrect!

Although there is a "Cc" list on p. 3 of Exhibit J, plaintiff was not entirely certain to

---

[5]  This exhibit, introduced by plaintiff at his grievance hearing, is confusing. At his deposition, he could not recall the precise sequence of events. However, the "hatch" marks on p. 2 reflect that this text may have been appended to the e-mail plaintiff sent to Dale Klein at 10:32 p.m. on January 30th, and it appears that Dr. Klein forwarded the entire message on to the individuals identified at the top of page 1 as addressees and cc's. Exhibit H at 66-71.

[6]  Dr. Abdurrahman's response to Dr. Adams does not address why he did not notice the e-mail from November which first advised of a budget cut.

whom he copied this e-mail, but indicated that he believed he had sent it to Dr. Klein, Dr. Nelson (another A&M faculty member working on the project in question), and either David Watson or Rick Hartley of the ANRC. Exhibit H at 69-70. Plaintiff continued to receive grant awards and funds from the ANRC subsequent to this e-mail.[7]

The Arrival of Dr. Landsberger

In January 1997, Defendant Sheldon Landsberger, a tenured professor at the University of Illinois, was hired for the following Fall to join the UT faculty and to serve as Area Coordinator for the UT nuclear engineering program.[8] ME Chairman Lamb and Dean Streetman, had concluded that they needed to hire a senior person in the area to provide leadership and to "take the program to the next level," and Dr. Landsberger was hired with the expectation that he would create campus visibility, recruit students, mentor junior faculty, and help individuals look for research grants. Exhibit B at 305 (Klein), 505-06 (Streetman), 524, 526 (Lamb); Exhibit K.[9]

In March 1997, three months after joining the UT faculty as an adjunct but prior to his

---

[7] As reflected in Exhibit F, p. 3, plaintiff received an extension on the "Water Reactor" project (the subject of his e-mail) such that funding continued through January 1999. Likewise, he received a new ANRC grant on MOX Use in Reactors, covering the period 1/16/98 - 1/15/99.

[8] Although Dr. Lamb, chairman of the ME Department, had anticipated that Dr. Wehring would be able to 'build up' the nuclear program when he arrived in 1989, this had not occurred. Exhibit B at 521-23 (Lamb). General enrollment in nuclear engineering courses and the visibility of the program had been declining, and Dr. Wehring, a research physicist, spent much of his time at the NETL. Dr. Klein had become associate Vice Chancellor of the UT system in 1995 and was no longer able to devote full time to the nuclear engineering program. Exhibit B at 202 (Klein), 506 (Streetman).

[9] To further complicate matters, the nuclear group was, in the words of Dr. Lamb, a "fairly fractious situation"so Dr. Landsberger was "immediately cast into the role of trying to bring more cohesiveness out of a somewhat chaotic situation." Exhibit B at 524 (Lamb).

permanent relocation to the campus, Dr. Landsberger made a progress report to ME Chairman

Lamb and Drs. Wehring and Klein.[10] Exhibit M. In that report, Dr. Landsberger outlined a host

of plans for enhancing the Nuclear Engineering program.[11] In the penultimate paragraph of his

four page report, he observed that Dr. Abdurrahman was "in serious trouble to be promoted and

tenured given his current weak publication record" and averred that plaintiff needed to make a

focused "effort to publish several key papers."[12] Exhibit M at 4. Dr. Wehring shared this

---

[10] Dr. Landsberger made several visits to the UT campus before assuming his official duties. Exhibit B at 526. In order to expedite his involvement with the nuclear engineering program, Dr. Landsberger was made an adjunct faculty member in January 1997 and assumed his full duties in the fall of 1997. Exhibit L.

[11] These plans included the transfer of grant projects from U. Illinois to UT, meetings/lectures he was setting up to promote the use of the NETL facilities to non-nuclear faculty, his plans for revitalizing course offerings to attract first and second year ME students to the Nuclear Engineering program, and goals for building up graduate school enrollment. Exhibit M.

[12] Dr. Abdurrahman's publication record since becoming an assistant professor in 1993 at UT had several deficits. First, apart from a single 1993 article co-authored with his Ph.D thesis advisor and several other individuals at Rensselaer Polytechnic Institute, virtually all of plaintiff's publications while at UT were 1-2 page research "summaries" published in the Transactions of the American Nuclear Society (TANS). Exhibit B at 318 (Landsberger); Exhibit D at 3-6; Exhibit H at 117-19. Articles in the TANS are expressly limited to 900 words. Exhibit B at 47 (Koen), 327 (Landsberger). For examples, see Exhibit N. Moreover, the American Nuclear Society (ANS), publisher of the TANS, makes no bones about the "summary" nature of that publication. The ANS publishes three journals, one of which, Nuclear Science and Engineering (NSE), is the undisputed leading journal in the nuclear engineering field. Exhibit B at 107-08 (Wehring), 413 (Landsberger). On its website, the ANS publishes a separate "Information for Authors" section for each of its three journals (NSE, Nuclear Technology, and Fusion Science and Technology); in each case, the second sentence reads, in either whole or part, "Authors are encouraged to submit complete papers of work summarized in the Transactions of the American Nuclear Society" (emphasis added). Exhibit O.

Second, the level of peer review in the TANS is not considered rigorous. Exhibit B at 34, 49 (Koen), 107-08 (Wehring). Indeed, apparently even the ANS itself does not regard publications appearing in the TANS as peer-reviewed. See Exhibit P, The "American Nuclear Society Survey 2001," at question 28 ("Currently, papers presented at ANS national meetings are not peer-reviewed. If the papers presented were peer-reviewed, would you be more likely, equally likely, or less likely to attend ANS national meetings?"). According to plaintiff, the "vast majority" of the papers presented at the ANS conferences are those recently published in the TANS (excepting only "papers not of a technical

(continued...)

progress report with plaintiff at the time. Exhibit B (Abdurrahman) at 92. Indeed, plaintiff

avers that Dr. Landsberger told him on several occasions, including prior to Dr. Landsberger's

formal arrival at UT, that publishing short summaries in the TANS, exclusively, was not going

to be sufficient for tenure and that plaintiff needed to publish full length journal articles in peer

reviewed journals.[13] Exhibit H at 117-120. Plaintiff, however, chose not to heed this advice.

Exhibit B at 318-19, 328, 330 (Landsberger); Exhibit D.[14]

In June 1997, plaintiff received feedback from Defendant Lamb regarding the report of

the ME Budget Council Productivity Committee, which had met with plaintiff and reviewed his

performance.[15] Based upon the Productivity Committee's report, Dr. Lamb advised plaintiff that:

---

[12](...continued)
nature"). Exhibit H at 152-54.

Third, many of plaintiff's publications list numerous authors, including postdoctoral fellows. Ex.
B at 380-81 (Landsberger); Exhibit D at 3-6; Exhibit N. This makes it difficult to tell who did the actual
work. Exhibit B at 308 (Klein)( from an academic institution, one expects to see two to three names,
with the graduate student's name listed first), 567 (Lamb)(for tenure in engineering, one should have "on
the order of 15 to 20 refereed papers of which approximately half should be either single authored or
with one doctoral student, and they should be full-length eight to 10 to 12 or more . . . printed pages").

[13] Plaintiff clearly understood the need to publish. Although he apparently disputes Dr.
Wehring's testimony that he gave him similar advice, Compare Exhibit B at 109-11 (Wehring) with
Exhibit at 119, he does agree that between himself and Dr. Wehring, "it was understood that after
sometime I would write some "journal" publications. Exhibit H at 119. He likewise admits that he
attended meetings with other assistant professors at UT at which these junior faculty were apprized of the
need to publish significant articles in peer review journals. Exhibit H at 120.

[14] Plaintiff's view appears to be that because Dr. Wehring, a tenured professor in his sixties,
published in the TANS, the TANS was identified on a list of approximately 98 "premier journals"
identified by the ME faculty in a 1995 e-mail, and summaries appearing in the TANS were listed in
faculty annual reports of publications under the heading "refereed archival journals," he did not need to
listen to Dr. Landsberger with regard to what was required for tenure.

[15] The membership of the Productivity Committee changes from year to year. Although they
raised the TANS issue with plaintiff, according to plaintiff "they really did not have an opinion one way
(continued...)

-8-

[Y]our research productivity has been of a level which is consistent with recent candidates whereas your teaching record has been below that exhibited by our recent candidates for promotion. Your service record has also been at a borderline level. I also indicated that you had not had an effective level of communications with the Chairman's office and other administrative offices with respect to reports and other materials with deadlines.

As I related to you, my belief is that your overall performance at this time would not result in a strong positive vote of the Budget Council. . . . Thus, at present I think your chances of being promoted are, at best, about 50/50 . . . .

Exhibit Q.

Throughout 1997, plaintiff continued his pattern of publishing exclusively in the TANS. In the late fall of 1997, in consultation with ME chairman Lamb and after advising plaintiff, Dr. Landsberger sent each of four nationally known professors in the nuclear engineering field a package of materials, including Dr. Abdurrahman's resume and copies of publications, along with a letter asking that they review the materials.[16] Exhibit B (Landsberger) at 349-50. The letters explained that plaintiff would be eligible for tenure the following year and asked for feedback regarding the quality and relevance of his research and whether he would be likely to receive tenure at their respective institutions. Exhibit R. All four responded, and all were highly critical of plaintiff's publication record.[17] In particular, they criticized his lack of significant

---

[15](...continued)
or the other because none of them was from the nuclear field." Exhibit H at 151-52.

[16] A copy of the letter appears at Exhibit R. Dr. Lamb explained that the decision to seek the external review was due to the small size of the UT nuclear engineering program and the fact that the faculty "did not see eye to eye on a lot of issues. . . .[W]e would not have done that if there had been a large number of people in the group who could have come to a consensus decision . . . . and so we felt like we needed external expertise . . . . " Exhibit B at 542-43.

[17] The professors whose views Dr. Landsberger solicited were Dr. Edward Larsen of the University of Michigan, Dr. Paul Turinsky of North Carolina State, Dr. Roy Axford of the University of
(continued...)

publications in peer reviewed journals.[18]

<u>The Tenure Decision</u>

Tenure decisions are matters of considerable gravity.[19]  The tenure review process

accorded plaintiff included several discrete steps and safeguards, including review by the tenured

faculty in the nuclear engineering program, review and a vote on tenure by the ME Budget

Council (comprised of the thirty-four full professors in ME), review at the College of

Engineering level by a six member committee composed of representatives from each

department, review by the Dean, and, finally, a review at the President's Office.[20]  Exhibit Q.

---

[17](...continued)
Illinois, and Dr. John Dorning from the University of Virginia.  Exhibit S.  See also Exhibit B at 348-56
(Landsberger).

[18]  Although plaintiff did thereafter write and submit some articles for publication in journals
other than the TANS, at the time his dossier for tenure was prepared in September 1998, none of these
articles had been published, one had been "accepted" for publication but not yet published, and the rest
were "in review" or "to be submitted."  Exhibit D at 5-6.  The article that had been accepted, number 29
on p. 5 of Exhibit D, was co-authored with four other individuals, including his former Ph.D thesis
advisor (Block), and two other Rensselaer faculty who had served on his Ph.D committee when he was a
student there (Harris and Slovacek).  Exhibit H at 11-12.

[19]  In a May 1, 1998 memorandum to Deans and Department Chairs, President Faulker
admonished:

   The granting of tenure has consequences of great magnitude and long life and must be
   considered especially carefully.  Tenure should be awarded only when there is a clear
   case that the best interest of The University is served by doing so.  In the review process,
   the candidate's record should be examined not only for evidence that the candidate has
   made contributions of appropriate magnitude and distinction in teaching, research, and
   service, but also for evidence that the candidate can sustain appropriate contributions
   through an extended career with The University."
Exhibit T.

[20]  As Dr. Lamb explained in an e-mail memorandum to the nuclear engineering faculty, "[t]he
second step in the process occurred last semester when Dr. Landsberger, as NE Area Coordinator, began
an internal review of Naeem's performance.  This area-level review is required by the Budget Council
(continued...)

The tenure dossier likewise included letters of reference from faculty at other universities.[21] Of these, the references written by the individuals selected by plaintiff were, with one exception, lukewarm, and the letters provided by the external reviewers selected by Dr. Lamb were uniformly negative.[22] Exhibit Y. The dossier also included "Budget Council" statements

---

[20](...continued)
since it wants all promotion candidates to be endorsed strongly by the senior faculty of the area. As part of this review, Landsberger circulated Naeem's resume to a number of prominent academicians of the type who would be requested to furnish assessments for inclusion in the dossier. . . . Exhibit U.

[21] Plaintiff maintains that all of the outside letters of reference should have been solicited from individuals selected by him. There is no evidence for this proposition. Indeed, in a memorandum, entitled "Guidelines for the Preparation of Supporting Materials and the Management of Tenured and Tenure-Track Candidate Files," dated Fall 1998, UT departmental officials were advised, inter alia, "Responsibility for developing a list of appropriate outside reviewers rests with the department chair/budget council. Candidates may suggest names of possible reviewers, but the chair/budget council are not bound by the candidate's suggestions and shall select outside reviewers as they deem appropriate. As a general rule, about half of the reviewers should be chosen from the candidate's preference list, and the others should be arm's length evaluations from recognized experts at peer institutions." Exhibit V at p. 6. Moreover, according to ME chairman Lamb, the Provost had made it very clear that he did not want "crony kinds of letters"; he wanted objective letters. Exhibit B at 547. Plaintiff's proposed list, however, contained the names of research collaborators, individuals with whom he had written articles, and individuals who were associate rather than full professors, and failed to include "anyone from the top Nuclear programs in the country." The faculty list ultimately used included three of the individuals identified by plaintiff, and five selected by Dr. Lamb with input from the UT nuclear engineering faculty. Exhibit B at 113-14 (Wehring), 547 (Lamb); Exhibit W; Exhibit X.

[22] It is true that four of these letters were written by the same individuals who had been asked to review and comment upon plaintiff's publications in the fall of 1997 and, presumably, could have been expected to provide negative letters again. However, as Dr. Landsberger explained, "these individuals represented some of the kingpins in the computational areas in the nuclear engineering program," which was plaintiff's field. Exhibit B at 354. Indeed plaintiff has acknowledged that, "nuclear engineering is a very small field, there are only a handful of departments in the country." Exhibit B at 26.

As for the three letters written by plaintiff's references, one individual, professor Laurence Miller, wrote a *one paragraph letter* in support of plaintiff's candidacy for *tenure* which described plaintiff as an excellent former student and a "pleasant young man," who was "polite, energetic and eager to learn. . . . He presents himself [at ANS conferences] as a knowledgeable professional, and he appears to be well respected by his peers." Exhibit Y. Another individual selected from plaintiff's reference list, Trent Primm, from the Oak Ridge National Laboratory, described plaintiff as "average in the field of reactor physics," noting that he could not "comment on the originality of Dr. Abdurrahman's
(continued...)

prepared by Drs. Landsberger and Wehring. Exhibit Z. Not surprisingly, these were largely critical, noting problems with plaintiff's teaching and his management of graduate students as well as with his publication record.

The faculty members on the Budget Council had an opportunity to review plaintiff's tenure dossier and ultimately voted 24:4 against tenure for plaintiff (and six "absent") in a secret ballot.[23] Exhibit AA; Exhibit B at 109 (Wehring). This negative vote was echoed in a separate Statement of the Department Chair, prepared by Dr. Lamb, which identified still additional problems with plaintiff, including the observation that in recent exit surveys of engineering students, Dr. Abdurrahman's name "appears regularly as one of the three 'worst' teachers they had encountered in Mechanical Engineering." Exhibit BB.

When plaintiff's file was reviewed at the College Committee level he fared no better. That group, comprised of six representatives (one from each department within the College of Engineering) voted unanimously against tenure for plaintiff.[24] Exhibit AA. The assessment of

---

[22](...continued)
work" because Primm had defined the scope of all of the light water reactor work that plaintiff and his students had performed. Exhibit Y.

[23] Dr. Klein did not participate in the Budget Council decision, did not vote, and did not tell or encourage anyone else how to vote. Exhibit B at 284. Dr. Wehring testified that he voted against tenure for plaintiff and acknowledged that he was concerned by the absence of independent full length papers published in peer review publications. Exhibit B at 109-11. Dr. Koen was in Japan and did not participate in the Budget Council vote, but testified at the grievance hearing that he was "on record with Naeem as saying [he] did not think [plaintiff] should have been promoted. Exhibit B at 50-51.

[24] The individual who was assigned primary responsibility to review plaintiff's dossier and make a recommendation to the group, Professor Carey Graham of the Department of Aerospace Engineering, testified at the grievance hearing that he recommended against tenure for plaintiff. Exhibit B at 430-33. He explained that his procedure was to look first at the file and form his own judgment before reading any of the Budget Council statements and that he had done so in this case. Exhibit B at 427-436. He
(continued...)

-12-

defendant Streetman, Dean of the College of Engineering, likewise recommended against tenure, noting the absence of journal publications, student complaints indicating that plaintiff was "hard to find" or "not available," and the overall negative nature of the reference letters. Exhibit CC; Exhibit B at 496-501. The final review was conducted by the President's office, which concurred with the recommendation of the Budget Council, the ME department chair, the College Committee, and the Dean that plaintiff receive a terminal appointment for academic year 1999-2000. Exhibit AA.

## ARGUMENT

In Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986), the Supreme Court reaffirmed that summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Here, plaintiff lacks evidence regarding several crucial pieces of his case. With respect to his First Amendment claim, he cannot show that he spoke out about a matter of public concern, further, none of the defendants involved in the tenure decision was aware of his "speech." As for his discrimination claim under § 1981, he bears the ultimate burden of proving he was qualified for tenure, yet the evidence, including the testimony of his own witnesses at the grievance hearing and his own references, compels a finding that he is not qualified. Finally, plaintiff continues to fail to state a claim under Title VI.

---

[24](...continued)
reviewed plaintiff's resume, his articles, and student comments, and testified at the grievance hearing that he did not recall ever seeing teaching scores as low as some plaintiff had received. Exhibit B at 433-34. He even read the articles that plaintiff cited on his resume as having been "accepted" for publication along with "one or two" that had been submitted, and observed that these articles were 'pretty short". He concluded that plaintiff's teaching performance and depth of research was not adequate to support tenure. Exhibit B at 429-30. Dr. Graham is not a defendant.

Thus, defendants are entitled to summary judgment as a matter of law.

## I. Plaintiff Has Failed To State A Cause Of Action For Retaliation Under The First Amendment

Where an employee seeks to prevail on a First Amendment retaliation claim, the Supreme Court has set forth the following test: (1) the plaintiff must show that the speech involved a matter of public concern; (2) he must prove that the speech was a substantial or motivating factor in his termination; and (3) the defendant can avoid liability by showing that it would have taken the same action even in the absence of the protected conduct. Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gerhart v. Hayes, 217 F.3d 320, 321 (5th Cir. 2000). In this case, plaintiff's speech did not involve a matter of public concern, and even assuming, arguendo, that it did, it played no role in his denial of tenure nearly two years later particularly where, as here, the only individuals aware of the speech had nothing to do with the tenure decision.

Moreover, the statute of limitations for a claim under 42 U.S.C. § 1983, the statute pursuant to which plaintiff pursues his First Amendment claim, is two years, thus only actions occurring within the two years preceding the filing of his suit are at issue. The only such action is the actual denial of tenure itself.

### A. Plaintiff's "Speech" was Unprotected by the First Amendment Because it Did Not Address a Matter of Public Concern

Whether the speech at issue is a matter of "public concern" is a legal question and, thus, appropriate for resolution on summary judgment. In Connick v. Myers, 461 U.S. 138, 147 (1983), the Court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest" he is not entitled to federal court review of a resulting personnel action. Here, the "speech" plaintiff hoists

-14-

as a shield against his unimpressive tenure credentials is his single e-mail of January 30, 1997, addressed to Marvin Adams, a faculty member at Texas A&M with whom plaintiff was working on an ANRC project, which plaintiff copied to Paul Nelson (another A&M faculty member working on the project), one or two employees of the ANRC involved with the administration of the project, and defendant Dale Klein, who was the chairman of the ANRC board of directors.[25] While not speaking as an actual "employee" of the ANRC, plaintiff was speaking as an active participant in the ANRC grant program and as a faculty member of one of the three universities forming the ANRC consortium, and he was addressing individuals with whom he dealt in the grant process on a regular basis.

Moreover, notwithstanding plaintiff's "artful pleading" averring that he was bringing to light "misuse of allocated research funds" and "problems" with "the operations of the program" (see Original Complaint at par. 4.22), the actual text of the e-mail is far more mundane. Indeed plaintiff's e-mail is basically an apology to Dr. Adams for not having noticed the e-mails Adams had sent to him months earlier, advising plaintiff of a reduction in their joint budget. Confronted on January 30th with a shortfall he should have noticed back on November 9th, plaintiff asserts in his e-mail that "the Center is to be blamed for this confusion . . ." Exhibit J at p. 1. This speech is clearly self serving and hardly on a matter of public concern.

The follow-on language is the closest plaintiff comes to speech on a matter of public concern:

> I would like to use this opportunity to relate to the decision makers in the Center that *we* can't keep modifying budgetary decisions till the last minute. It takes

---

[25] Drs. Adams and Nelson are both Caucasian. Exhibit H at 33.

some time to recruit students and other personnel to work on a particular project .
. . As you can see, I am copying several Center leaders and decision makers with
this message.

(Emphasis added).  However, even this speech fails the test.

A recent Fifth Circuit decision, <u>Kennedy v. Tangipahoa Parish Library Board of Control</u>,

224 F.3d 359 (5th Cir.), <u>reh</u>. and <u>reh en banc den'd</u>, 239 F.3d 367 (2000), surveyed all of the

cases involving "mixed speech" in the circuit and concluded that there were "three reliable

principles":

> First, the content of the speech may relate to the public concern if it does
> not involve solely personal matters <u>or strictly a discussion of management policies</u>
> <u>that is only interesting to the public by virtue of the manager's status as an arm of</u>
> <u>the government</u>. . . . If releasing the speech to the public would inform the
> populace of more than the fact of an employee's employment grievance, the
> content of the speech may be public in nature . . .  Second, speech need not be
> made to the public . . . but it may relate to the public concern if it is made against
> the backdrop of public debate . . . . And third, the speech cannot be made in
> furtherance of a personal employer-employee dispute if it is to relate to the public
> concern.

224 F.3d at 372 (citations omitted)(emphasis added). Recall that plaintiff was receiving ANRC

funded grants every year from 1995-99 and continued to submit new proposals.  In conjunction

with those grants, he "had to make commitments to students and a postdoc who were going to

work on the new tasks" (Exhibit J). His comments in this context are, thus, those of a junior

manager to senior management regarding the size of his proposed budget, the impact of changes

on hiring commitments, and the like.  Plaintiff is speaking, not as a citizen, but as a participant in

a work related process that directly affects him. While the overall mission of the ANRC might be

of public interest, in the context of plaintiff's e-mail, there is no backdrop of public debate, no

discussion about the merits of funding this proposal versus that one, no suggestion that there is

any impropriety in the handling of funds or any other matter of public concern.

**B.** **Plaintiff Cannot Show That His Speech was a Substantial or Motivating Factor in the Tenure Decision, Because None of the Decision Makers was Aware of Plaintiff's "Speech"**

Implicit in the analysis whether the speech of a public employee comprises constitutionally protected expression is that there *be* speech, such that those taking the adverse action giving rise to the suit are at least aware of it. In this case, however, only one of the seven individual defendants, Dale Klein, either saw or was otherwise aware of plaintiff's solitary e-mail and/or the "complaint" it contained.[26] Under such circumstances, it becomes tautological to state that there exists no causal link between any actions they took and plaintiff's speech, and that the "same result," denial of tenure, would have obtained regardless of the speech, because the decision *was in fact made* without knowledge of the speech. As to these defendants, President Faulkner, Provost Eckland-Olson, Dean Streetman, Associate Dean Armstrong, former Chairman Lamb, and Dr. Landsberger, no further examination under Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977) should be required, and plaintiff's First Amendment claim should be dismissed.

Dr. Klein was a recipient of the e-mail. However, he played no role in the tenure

---

[26] See Exhibits DD, EE, FF, and GG (affidavits of defendants Faulkner, Eckland-Olsen, Armstrong, and Streetman). See also Exhibit B at 558 (Lamb) (when asked at the grievance hearing regarding plaintiff's alleged complaint regarding the ANRC, he replied "I know nothing about that."). Although the complaint avers that Dr. Landsberger was enlisted by Dr. Klein in a "campaign" (Original Complaint at par. 4.27) against plaintiff on account of said speech, there is no evidence whatsoever to support this naked assertion. Dr. Landsberger was only an adjunct faculty member in January 1997 and was still living in Illinois. There is absolutely no basis for believing he had any knowledge of plaintiff's single e-mail or of his complaint, and plaintiff has conducted no discovery on this issue. If anything, as a faculty member at UT doing nuclear research and subject to the same ANRC funding delays and budget cuts as Dr. Abdurrahman, Dr. Landsberger would likely have shared plaintiff's views had he known about them.

decision. He was not present at the ME Budget Council meeting, did not vote on the tenure decision, nor did he tell any other faculty member how to vote. On these facts, there can be no basis for finding liability against him on a First Amendment retaliation claim. Gerhart v. Hayes, 217 F.3d at 322.

Moreover, plaintiff was denied tenure in December 1998, nearly two years after his January 1997 e-mail. Thus, even if contrary to all of the evidence, one or more defendants who acted on plaintiff's tenure decision had been aware of his speech, this inordinate passage of time suggests that a retaliatory motive was "highly unlikely." Mato v. Baldauf, No. 00-50522, 2001 WL 1117321 at *7 (5th Cir. Oct. 9, 2001)("The fact that approximately a year and a half passed . . . does not support an inference of retaliation"), citing, Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 268 (5th Cir. 1994)(ten-month hiatus between plaintiff's complaint and her termination "suggests that a retaliatory motive was highly unlikely"). As plaintiff cannot possibly prevail on his First Amendment claim, all of the individual defendants are entitled to summary judgment as to this claim.

## II.     Plaintiff Has Failed To State A Claim Under 42 U.S.C. § 1981

Plaintiff asserts that he was subject to discrimination in contravention of 42 U.S.C. § 1981, which guarantees all persons the same rights to make and enforce contracts . . . as is enjoyed by white citizens, because he is an Arab. The statute of limitations for claims arising under § 1981 is two years. Price v. Digital Equipment Corp., 846 F.2d 1026, 1028 (5th Cir. 1988). Although plaintiff's complaint, filed on December 19, 2000, recites a litany of allegedly ill-motivated events commencing in 1996, only the denial of tenure itself, which occurred on

December 21, 1998, falls within the two year time period.[27]

A § 1981 claim is subject to the same order of proof formula that was developed for claims arising under Title VII of the Civil Rights Act of 1964 (as amended). Lawrence v. University of Texas Medical Branch, 163 F.3d 309, 311 (5th Cir. 1999), the so-called "McDonnell-Douglas/Burdine" burden shifting three pronged analysis. The first step requires that plaintiff make out a prima facie case of discrimination, which includes showing that he was qualified for the position that he sought (in this case promotion to the rank of tenured associate professor). Based upon the record evidence, however, plaintiff cannot possibly make such a showing. Tenure candidates are required to have made outstanding contributions in teaching, research, and service. Exhibit T. Due to his poor teaching performance (routinely rated among the three "worst" professors in the ME department) and inadequate publication record (consisting almost entirely of 900 word "summaries," most of which had multiple authors), none of the UT

---

[27] These allegations include that his office assignment at the NETL (as opposed to his primary office, which was on campus) changed several times and eventually he lost his office there, that Dr. Landsberger "harassed" him by telling him he needed to publish in order to get tenure, that he "interfered" with plaintiff's graduate students and encouraged them to work with others, that Dr. Klein and Dr. Landsberger would not allow him to use "overhead" return from the NETL to support a postdoctoral fellow hired by plaintiff, that Dr. Landsberger solicited "negative" letters of reference from individuals other than those on plaintiff's list, defendants made reference to plaintiff's refusal to participate in social events where alcohol was served, and the like. See Original Complaint at paras. 4.28 - 4.37. Even taking these assertions as true (although defendants hotly dispute them), none of these actions, which, in any event, all fall outside the two year limitations period, rises to the level of an "adverse' action, nor collectively would they be sufficient to have created a "hostile work environment." Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995)(adverse actions are such ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating); Celestine v. Petroleos de Venezuella SA, 2001 WL 1090522 (5th Cir. Sept. 18, 2001)(to create a hostile environment, discrimination must be intentional, pervasive, and regular). To the extent they are alleged as evidence of ill motive in the tenure decision, they have no bearing on plaintiff's poor publication record, which was entirely within his control, or his poor teaching record, which was based upon student evaluations, thus the actions described in plaintiff's assertions, even if true, played no role in the tenure decision.

-19-

nuclear engineering faculty supported his bid for tenure.[28] Moreover, the external reviewers criticized his publication record (they did not have access to his teaching scores), and his own references, with one exception, were not supportive.

Even assuming, *arguendo*, that plaintiff is deemed to have somehow demonstrated some "minimal qualification" for tenure, he cannot possibly carry his burden of proving that he was deserving of tenure when the entire membership of the UT nuclear engineering faculty has already testified that he was not qualified. His total lack of evidence on this crucial point is fatal to his claim and summary judgment for defendants on his § 1981 claim is compelled.

### III. Even Assuming, *Arguendo*, That Plaintiff Has Stated A Claim Under Either The First Amendment Or § 1981, Each Of The Individual Defendants Is Entitled To Qualified Immunity

As this Court is well aware, government officials "performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982); Butz v. Economou, 438 U.S. 478, 503-04 (1978)(scope of immunity law is the same in actions against state officials). Whether the asserted federal right was clearly established at the time at issue is a question of law. Elder v. Holloway,

---

[28] As there had not been a promotion in the nuclear engineering area in many years, plaintiff can point to no similarly situated individual and claim that he/she was treated differently. Plaintiff's only argument appears to be that other faculty members published in the TANS and included those publications on lists, such as annual reports, under the heading "Refereed Archival Journals." This is true. However, the objection was not that plaintiff had articles in the TANS, but, rather, that he published almost *exclusively* in the TANS and lacked independent full-length papers published in peer reviewed journals demonstrating an ability to "carr[y] through a fairly big project and ge[t] results." Exhibit B at 109-11(Wehring). See also Exhibit B at 308-09(Klein), 562-63 (Lamb), 33-34 (Koen) regarding a tenure candidate's need to publish significant journal articles if he is to be successful. Moreover, even plaintiff admits that Dr. Landsberger told him repeatedly of the need to publish full length papers articles, thus there can be no doubt that plaintiff was on notice of what was required.

510 U.S. 510, 515 (1994), discussing Davis v. Scherer, 468 U.S. 183 (1984). The burden of proving the violation of a clearly established right rests with the plaintiff. Thompson v. Upshur County, Texas, 245 F.3d 447, 456 (5th Cir. 2001).

The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).[29] Quoting from the Eleventh Circuit, the Fifth Circuit has observed, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." Pierce v. Smith, 117 F.3d 866, 882 (5th Cir. 1997), quoting, Lassiter v. Alabama A.&M. University, 28 F.3d 1146, 1150 (11th Cir. 1994)(en banc).

Finally, as qualified immunity "turns only upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. Crawford-El v. Britton, 523 U.S. 574, 588 (1998); Thompson v. Upshur County, Texas, 245 F.3d at 457. As shown in part C below, when the actions of the individual defendants are assessed, none of those actions can be said to violate clearly established law in the particularized manner required by Anderson v. Creighton.

---

[29] Anderson involved the warrantless search of a home, in reliance upon claimed exigent circumstances, which was subsequently held unlawful. The Court held that the FBI agent should have been permitted to argue that he was entitled to summary judgment on the ground that, "in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search ... was lawful." 483 U.S. at 641.

**A.    Each Of The Individual Defendants Is Entitled To Qualified Immunity With Respect To Plaintiff's First Amendment Retaliation Claim Because The Law Was Not Clearly Established That Plaintiff's Speech was Protected**

As the Supreme Court observed in <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991), <u>reh. den'd</u>, 501 U.S. 65,  "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" . . . is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Here, as explained in Section IA above, plaintiff's solitary e-mail fails the threshold inquiry that the speech at issue have been on a matter of "public concern." Thus, the individual defendants are entitled to a dismissal of this claim based upon qualified immunity.

Assuming, *arguendo*, the Court were to conclude, as a matter of law,  that some or all of plaintiff's solitary e-mail comprises speech on a matter of public concern, defendants are still entitled to qualified immunity,  because pre-existing law neither "dictated" nor "compelled" the conclusion that predicating an action upon this e-mail would violate federal law. <u>Pierce v. Smith</u>, supra.  The e-mail comprising plaintiff's allegedly protected speech was written on January 30, 1997, while the tenure denial occurred in December 1998.  A review of the mixed speech cases during this period underscores that such speech would not have been regarded as "protected."  In conjunction with its round-up of self-described  "mixed speech" cases, the court in <u>Kennedy v. Tangipahoa Parish Library Board of Control</u>, <u>supra</u>, discusses <u>Gillum v. City of Kerrville</u>, 3 F.3d 117, 121 (5th Cir.1993), which turns on "the hat" worn by the employee at the time the speech was made, and then skips to <u>Benningfield v. City of Houston</u>, 157 F.3d 369, 375 (5th Cir.1998), which it characterizes as "our next mixed speech case." 224 F.3d at 371.  In <u>Benningfield</u>, after conducting "an abbreviated content-context-form analysis" the court

-22-

ultimately examines the content of the speech (police department employees complained about wrongdoing, such as contamination of criminal histories caused by mismanagement and, in some instances, deliberate tampering), and concludes that the speech relates to the public concern.[30]

Focusing on the hat worn by plaintiff at the time he uttered his "speech," it is apparent he was speaking as an active participant in the ANRC grant process about his current grant and possible future grants ("we can't keep modifying budgetary decisions till (sic) the last minute"). Exhibit J. If we instead rely upon the content, he complains of no wrongdoing, mismanagement, or the like, unlike the situation in Benningfield. Either way, the individual defendants would be entitled to assume that plaintiff's "speech" was not protected and that actions taken on account of that speech (assuming there were any) would not violate "clearly established constitutional rights." At a minimum, "[i]f it is unclear whether the [e-mail] satisfies the public concern requirement, then [defendants] [are] entitled to qualified immunity ... because [their] actions did not violate [plaintiff's] clearly established First Amendment Rights." Gonzalez v. Lee County Housing Authority, 161 F.3d 1290, 1297 (11th Cir. 1998).

**B.      Each Of The Defendants Is Entitled To Qualified Immunity With Respect To Plaintiff's Discrimination Claim Under § 1981**

To defeat the individual defendant's entitlement to qualified immunity, plaintiff has to show that each defendant acted in a manner which would have been understood objectively to violate his right to be free from discrimination based upon his race. As with his claim under the First Amendment, this claim is governed by a two year statute of limitations, and only the tenure denial itself comes within the limitations period. Not only is the record utterly devoid of any

---

[30] The Kennedy court goes on to discuss mixed speech decisions from 1999, but for purposes of the qualified immunity inquiry in this case, they are outside the relevant time window.

evidence of intentional race-based discrimination, but there is overwhelming evidence that plaintiff was simply not qualified for tenure, given his poor publication record and his frequent rating as one of the three "worst" professors in ME.

**C.** **The Individual Defendants did not Violate Clearly Established First Amendment or § 1981 Rights of which a Reasonable Person would have Known, Because Their Actions Were Objectively Reasonable**

With respect to both plaintiff's First Amendment claim and his discrimination claim under § 1981, applying the principles of <u>Anderson v. Creighton</u> to the individual defendant's actual conduct compels the conclusion that these defendants were exercising their discretion in an objectively reasonable manner and that none of the actions taken by any of the individual defendants violated clearly established law in the particularized manner required by <u>Anderson v. Creighton, supra, Pierce v. Smith</u>, 117 F.3d at 880, or <u>Doe v. Louisiana</u>, 2 F.3d 1412 (5th Cir. 1993).

Of crucial importance, plaintiff's laundry list of supposedly ill-intentioned actions all fall outside the two year statute of limitations, and none would rise to the level of an adverse action even if a claim based upon such an action were not untimely. <u>Dollis v. Rubin</u>, 77 F.3d 777, 781-82 (5th Cir. 1995)(adverse actions are ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating). To the extent the allegations discussed below are offered by plaintiff as evidence of ill motive, a motive inquiry is irrelevant in determining the applicability of qualified immunity. Finally, none of the acts described in the allegations discussed below, even if taken as true, would have had any bearing on the tenure decision itself. The denial of tenure was predicated chiefly upon plaintiff's poor publication record, which was entirely within his own control, and his poor teaching record, as reflected in

-24-

his student evaluations.

<u>Defendant Dale Klein</u>[31]

Dr. Klein is the only defendant who was actually aware of plaintiff's January 30, 1997 e-mail. However, he did not attend the ME Budget Council meeting, did not vote on plaintiff's tenure candidacy, and did not advise anyone else on how to vote. He played no role in the tenure denial. He is therefore entitled to dismissal based upon qualified immunity.

Plaintiff's complaint is long on invective and short on substance with respect to Dr. Klein; it posits "conspiracies" and "campaigns" against plaintiff. Stripped of the retaliatory "motives" hypothesized by plaintiff, however, Dr. Klein's actions are objectively reasonable. The complaint alleges that Dr. Klein:

1. Recommended in 1997 that plaintiff's employment be terminated;
2. Opposed the continuing availability of office space at the NETL;
3. Opposed the utilization of overhead returns funds from grants which plaintiff had obtained, "contrary to established practice";
4. Caused an ANRC grant which would have benefitted plaintiff's research to be withdrawn causing serious difficulties since financial commitments already had been made to students and a postdoctoral associate;
5. Caused one of plaintiff's grants to be "assigned" to another individual, causing plaintiff to "undertake considerable documentation to obtain approval for use of funds;"
6. Caused Dr. Landsberger to solicit letters opposing plaintiff's "continued employment and the application for promotion and tenure;" and
7. "Conspired" to apply to plaintiff's tenure application different standards for research and publications than those applied in the past to tenure applicants in the department.

---

[31] At his deposition, when asked why he believed that Dr. Klein was "motivated" to try to "get" plaintiff to leave UT, plaintiff pointed to his e-mail "criticizing" the ANRC and his belief that Dr. Klein "did not like" him. He acknowledged that, from his perspective, Dr. Klein and Dr. Wehring (who is Caucasian) likewise "were not on the best of terms." Exhibit H at 104-05. Plaintiff did not state that he believed that his race was a factor in his relationship with Dr. Klein.

Complaint at paras. 4.26, 4,28, 4,29, 4,32. [32]

Regarding (1) the supposed recommendation that plaintiff's employment be terminated in 1997, Dr. Klein denies having done so and there is no evidence that he made such a recommendation. Even were he to have made such a recommendation, however, it was, in the event, not acted upon. With respect to item (2), Dr. Klein played no role in the assignment of office space at the NETL. Exhibit B at 300-01 (Klein). Dr. Wehring was the Director of the NETL and ultimately responsible for the assignment of offices. Moreover, the evidence is uncontroverted that plaintiff, who had an office on campus, (a) made very little use of his NETL office, and (b) there was an office shortage at that facility. [33] Under these circumstances, even had Dr. Klein been involved in the office reassignments, distributing limited office space to individuals who truly needed it would certainly have been reasonable. Allegation (3), concerning the denial of permission to use "overhead" return from the NETL, refers to plaintiff's refusal to use funds from one of his own university accounts to pay his postdoctoral fellow, and his request that the NETL pay his employee instead. Dr. Klein, then Vice Chancellor, had been asked to head up an executive committee to try to resolve significant cash flow problems at the

---

[32] It is impossible to tell which of the defendants plaintiff accuses of making "reference to Dr. Abdurrahman (sic) refusal, consistent with his religious principles, to participate in social events involving the consumption of alcoholic beverages, suggesting that such reticence was indicative of a lack of collaboration and collegiality by Dr. Abdurrahman." Complaint at par. 4.37. Assuming any of the defendants made such a remark, it is at best a "stray comment" and probative of nothing. It is likewise not possible to tell from the complaint which defendant he accuses of discouraging students and postdoctoral associates from working with him (para. 4.30), although in his deposition he ascribed this conduct to defendant Landsberger.

[33] Dr. Landsberger, who was at the NETL three to four days a week, testified that he only saw plaintiff once at the NETL during Landsberger's first year at UT (Exhibit B at 355), while secretary Sheri Biggs has stated in her affidavit that plaintiff visited the NETL at most once a month during the two years she was assigned to the NETL at a workstation located by the entrance. Exhibit HH.

NETL; the situation was such that Dr. Klein was even having to supplement NETL funds with funds from his own research accounts. When he learned that plaintiff, who had funds in his own university account, had nonetheless asked the NETL to pick up the salary of a postdoctoral fellow hired by and working for plaintiff, Dr. Klein did direct plaintiff to use his own funds (which had been provided to plaintiff by UT as "start-up funds" back in 1993). See Exhibit II and Exhibit B at 248-49 (Klein).[34] Under the circumstances, there is certainly no reason for Dr. Klein to have believed he was violating plaintiff's rights.

Item (4) concerns a grant issued by the ANRC to a group of researchers, headed by Dr. Adams and Dr. Nelson at Texas A.& M., which included plaintiff. Although disagreeing with the policy, Drs. Adams and Nelson were well aware that ANRC required researchers working on projects initially developed using ANRC funds to pass any non-ANRC funding they might subsequently receive on that project "through the Center," which would then redistribute the funds back to the researchers, so that the ANRC would have an overview of the entire budget.[35] After being awarded a significant grant, but prior to funding, Drs. Adams and Nelson wrote a letter to the ANRC stating that they did not intend to abide by the "through the Center" policy regarding any additional outside funding they might obtain for the project. Plaintiff was not a

---

[34] If anything, a review of the e-mail correspondence on this issue demonstrates how incredibly insubordinate plaintiff was; after several exchanges between plaintiff and Dr. Klein, including a face to face meeting, and after receiving a direct order from Vice Chancellor Klein, assistant professor Abdurrahman directed an e-mail to his friend and colleague, Dr. Wehring, addressed to "Bernard Wehring, Director, NETL," which he copied to Dr. Klein, in which he states that he and Dr. Klein have been "unable to reach an agreement" and reiterates his unwillingness to pay the approximately $6,000 at issue out of his own university account.

[35] The rationale for this policy had to do with the ANRC's ultimate accountability to DOE for projects and the need to avoid inadvertent duplication of research between projects funded by the ANRC for DOE and projects being funded directly by DOE laboratories such as Oak Ridge National Laboratory.

signatory to this letter. Not surprisingly, the ANRC board of directors, of which Dr. Klein was the chairman, voted to withdraw the grant award. As a result, Drs. Adams, Nelson, and all of the other researchers on the project, including plaintiff, lost the promised funding.[36] Exhibit JJ. The withdrawal of the grant was directly attributable to the letter written by Drs. Adams and Nelson stating their refusal to agree to the ANRC's terms for issuing the grant, and even plaintiff acknowledges that the grant was withdrawn through "no fault" of his. Exhibit H at 39.[37] Given that the impetus for withdrawing the grant had nothing to do with plaintiff, no one in Dr. Klein's position would have had reason to believe his actions in carrying out ANRC policy were "objectively unreasonable."

For accounting purposes, when grants from sources outside the ANRC were funneled through the ANRC, the Nuclear Programs Manager for the ANRC, in this case, Carl Beard, would be identified as the "principal investigator, " even though the researcher who obtained the grant would, of course, receive the funds and the "credit." Item (5) involves an instance where this procedure was applied to a grant received by plaintiff. See Exhibit KK at par. 5. There is no evidence that Dr. Klein had anything to do with the processing of this particular grant or that he had anything to do with any alleged difficulties plaintiff experienced subsequently. Nevertheless, there is nothing objectively unreasonable about the application to plaintiff of this ANRC procedure, and certainly nothing that would suggest that Dr. Klein should have had any

---

[36] The lion's share of the grant money for this project, entitled "Novel Techniques for the Simulation of Particle Transport on Modern Parallel Computation Platforms," would have gone to the Texas A.& M. researchers. Exhibit H at 35-40.

[37] See also Exhibit II, p. 7, where, in the e-mail addressed to Dr. Bernard Wehring, Director of the NETL, plaintiff ascribes his need for NETL funds to pay his postdoctoral assistant to the withdrawal of a grant, subsequent to its award, for reasons having "nothing to do with me."

reason to believe that he was violating plaintiff's constitutional rights.

Item (6) asserts that Dr. Klein was involved in the decision by Drs. Lamb and Landsberger to solicit letters from well regarded nuclear engineering faculty from other universities in order to get an objective measure of plaintiff's prospects for tenure.[38] There is no evidence that Dr. Klein was involved in this process. Even if he was, the actions taken were objectively reasonable. See fn. 20 and Exhibit U. Given the small size of the UT nuclear engineering program, conflicts among the faculty, and plaintiff's apparent unwillingness to take any direction from Dr. Landsberger, seeking objective outside assessments of plaintiff's qualifications prior to putting him up for tenure was certainly well within the discretion of those who did so, and in no way objectively unreasonable.

Finally, plaintiff accuses Dr. Klein of having conspired with Dr. Landsberger and ME Chairman Lamb to apply different tenure standards to plaintiff than had been applied to tenure applicants in the past (item 7). There is no evidence whatsoever of any such "conspiracy." Similarly, there is no evidence that candidates seeking tenure in nuclear engineering were treated any differently than plaintiff. No one had been up for tenure in the nuclear engineering program since prior to Dr. Wehring's arrival in 1989 (and well before plaintiff's arrival in 1993). Thus, there is no evidence and no "similarly situated other" to whom plaintiff can point and assert that, but for his protected speech or his race, plaintiff would have been held to some other standard.

Rather, as the grievance hearing testimony demonstrates, there was unanimous agreement

---

[38] To the extent that plaintiff alleges that the letters that were received opposed plaintiff's "continued employment," there is no support for the allegation. The letters did indicate that plaintiff would be unlikely to receive tenure at the respective universities of each of the respective letter writers, but none suggested that plaintiff's appointment as an assistant professor should terminate prematurely. Exhibit S.

among all of the faculty who testified, including <u>all</u> of the UT nuclear engineering faculty (Drs. Koen, Wehring, Landsberger, and Klein) that publishing virtually nothing but two-page (900 word) summaries in the TANS was insufficient for tenure. Indeed, this view was echoed by the great majority of the nuclear engineering faculty at the various universities who were asked to provide references for plaintiff's tenure candidacy. Moreover, this view was evidently shared by the great majority of the faculty in ME (who, unlike the outside reviewers, were also privy to plaintiff's poor teaching evaluations) when they voted 24:4 against tenure for plaintiff.

The standards to which plaintiff was held for tenure reflected not a conspiracy but a shared understanding among tenured faculty nationwide regarding what is required to demonstrate scholarship and future research potential. Plaintiff was advised on numerous occasions that he needed to publish "independent" (i.e. not with authors senior in rank to him) full length journal articles in peer reviewed publications. That he did not do so is the fault of no one but himself. Neither Dr. Klein (who, again, did not even vote on plaintiff's tenure candidacy) nor any other defendant who voted against plaintiff's tenure candidacy based upon his poor publication and teaching records can possibly be deemed to have violated "clearly established law."

As all of his actions were objectively reasonable, Dr. Klein is entitled to dismissal based upon qualified immunity with respect to plaintiff's First Amendment and § 1981 claims.

<u>Sheldon Landsberger</u>

Plaintiff appears to blame Professor Landsberger, who was brought in to serve as Nuclear Engineering Area Coordinator for the express purpose of building up the program, for the bulk of his troubles at UT. When Dr. Landsberger's actions are viewed objectively, however, rather

than through the distorted lens of plaintiff (who seems never to have understood the scope of Dr. Landsberger's responsibilities as Area Coordinator and to have viewed Dr. Landsberger's every intervention as hostile or "interference"), Dr. Landsberger's actions are entirely reasonable and none can be said to have violated plaintiff's clearly established First Amendment or § 1981 rights.[39] Indeed, there is no evidence that Dr. Landsberger was ever made aware of plaintiff's January 1997 e-mail to the ANRC as he was still living in Illinois

In paragraphs 4.28 - 4.34 of his complaint, plaintiff catalogues his assertions against Dr. Landsberger. These include:

1. Opposing the continuing availability of office space at the NETL;
2. Opposing the use by plaintiff of NETL overhead returns;
3. The withdrawal of the ANRC grant after it had been awarded;
4. The assignment of one of plaintiff's grants to another individual;
5. Discouraging students and postdoctoral associates from working with plaintiff by statements suggesting that plaintiff would be unable to continue to support their work, that plaintiff would be denied tenure, and that these individuals "could be assured of continuing support by rejecting" plaintiff and working with other faculty, "even adjunct faculty;"
6. Instructing plaintiff not to submit new research grant proposals and not to recruit or accept new students;
7. Soliciting letters opposing plaintiff's continued employment and his application for promotion and tenure;
8. Soliciting negative letters of reference from individuals other than those on the list provided by plaintiff; and
9. Conspiring with Dr. Klein and Dr. Lamb to apply to plaintiff tenure standards for research and publications different from those which had been applied in the past.

Some of these actions have previously been discussed in connection with Dr. Klein, and for the sake of brevity the entire discussion will not be repeated herein. Re (1), Dr. Wehring was responsible for office assignments, not Dr. Landsberger. Moreover, Dr. Wehring maintained his

---

[39] See Exhibit BB at p. 2 ("Indeed, during the last two years when his research program came under additional scrutiny by senior faculty in his area, he was resentful of their interaction and did not heed their advice about his publication pattern"); Exhibit H at 120-21.

principal office at the NETL, and Dr. Landsberger was at the facility three to four days per week. Exhibit HH. In contrast, Dr. Abdurrahman was hardly ever there, and there was a severe shortage of office space due to the needs of the permanent staff and the increasing number of graduate students joining the nuclear engineering program as efforts to build up the program began. Under these circumstances, the fact that plaintiff was asked to share office space with other individuals rather than having an entire office reserved for his exclusive use would not have put a reasonable individual on notice that he was violating plaintiff's constitutional rights. Item (2), dealing with overhead returns, was discussed in conjunction with Dr. Klein, supra. Dr. Landsberger was involved in the matter only peripherally if at all. Directing plaintiff to pay his own employee with his own university funds rather than spending NETL funds being provided by Dr. Klein, who was trying to stabilize the NETL cashflow situation, was hardly unreasonable. Item (3) regarding the withdrawal of the ANRC grant has likewise already been discussed in conjunction with Dr. Klein. It was the ANRC board of directors that voted to withdraw the grant funding after the A&M faculty wrote their letter refusing to abide by ANRC conditions. Dr. Landsberger is not a member of the ANRC board and had nothing to do with this decision. Item (4) has already been discussed in connection with Dr. Klein. Dr. Landsberger appears to have had little, if any, role in the assignment, for accounting purposes, of Carl Beard (then an ANRC official) as principal investigator on the grant. It is undisputed that plaintiff listed himself as principal investigator for the grant on his resume and in his tenure dossier, and, thus, received "credit" for having obtained the grant in terms of his evaluation for tenure, and there was never any question that the grant was 'his.' Exhibit D, p. 13; Exhibit F, p. 3.

Item (5) alleges that Dr. Landsberger "encourag[ed]" graduate students to work with other

faculty, even "adjunct faculty," rather than plaintiff. There is only one instance in which Dr. Landsberger did so, and based upon the undisputed facts, his actions were eminently reasonable. Plaintiff was serving as the Ph.D advisor for a graduate student named Mohammed Elsawi. In the summer of 1998, Dr. Koen advised Dr. Landsberger that Mr. Elsawi had notified him that he was unhappy and was intending to leave UT and transfer to Northwestern University to finish his graduate studies there. As Area Coordinator for the Nuclear Engineering program, Dr. Landsberger was supposed to be building up the nuclear program, not watching dissertation candidates walk out the door, so Dr. Landsberger approached Mr. Elsawi to see if there was anything UT could do to encourage him to stay. One of the options offered was allowing Mr. Elsawi to do his dissertation under another faculty member, given that he was presently assigned to plaintiff and yet wished to leave.[40] Although Mr. Elsawi thereafter agreed to stay at UT and work with the adjunct faculty member, he quickly changed his mind again and abruptly announced that he was going to California to accept a position with a company there but would continue to work toward his degree with plaintiff as his Ph.D advisor. In light of his responsibilities as Area Coordinator, Dr. Landsberger's actions were objectively reasonable. Apart from Mr. Elsawi, there is no evidence that Dr. Landsberger suggested that any other

---

[40] There is no question that Mr. Elsawi had applied to and been accepted by Northwestern. See Exhibit LL. Mr. Elsawi told Dr. Landsberger and Carl Beard, who had recently become an adjunct faculty member, that he did not with to work any longer with plaintiff. See Exhibit KK, par. 4. He subsequently confirmed to Dr. Klein that he had told Landsberger that he did not wish to work with plaintiff. Although not present during these conversations, plaintiff nonetheless disputes them. Exhibit H at 132-35. He cannot dispute, however, that Mr. Elsawi was assigned to plaintiff at the time he submitted his application to Northwestern or that Mr. Elsawi had gone so far as to accept Northwestern's offer of admission into its graduate school program.

student of plaintiff's switch advisors.[41]

Plaintiff also accuses Dr. Landsberger (along with Dr. Lamb), of having instructed plaintiff not to submit research grant proposals and not to recruit or accept new graduate students (item 6). This is true. However, by that time (1998), plaintiff was about to begin the tenure process and was already on notice that his chances of making tenure were iffy at best. Exhibit Q, p. 2. As Dr. Lamb explained at the grievance hearing, grant proposals typically contain legal boilerplate promising that if awarded a grant, the grant recipient will be available to conduct the work. Given the very real prospect that tenure would be denied, however, there was a significant risk that plaintiff would not be around to complete work on any grants he might receive. Exhibit B at 552-53. This could place UT in a difficult position.

As for the request that he not recruit new students, Dr. Lamb expressed concern that plaintiff was taking too long to finish up the graduate students that he had. Id. Moreover, should plaintiff recruit new graduate students and then be denied tenure, such students would be placed in the position of having to scramble to identify a new Ph.D advisor and/or another source of research grant funds to support them. Given the circumstances, asking plaintiff to wait and see on the tenure decision before making commitments to either grant sponsoring agencies or students which might carry over beyond his termination date was objectively reasonable.

_____

[41] It is likewise true that after plaintiff was denied tenure, two graduate students left him (one transferred to the University of Michigan and the other took a job in industry and elected to switch to a Ph.D advisor there). While plaintiff apparently blames Dr. Landsberger for these defections, this is no record evidence to support this. In any event, as these students did not leave until after plaintiff had already been denied tenure (at which point it would have been in their best interests to find a thesis advisor with ongoing research who would be able to support them), their departure had nothing to do with the only adverse action at issue, the tenure denial. Thus even if Dr. Landsberger had encouraged them to leave plaintiff, which he did not, it would not have been unreasonable for him to do so as finding a more "secure" faculty advisor would certainly have been in the best interests of the students.

Item (7) was discussed, supra under Klein item (6). There is no record evidence that Dr. Landsberger sought "negative" letters, only that, after consultation with ME Chairman Lamb, he sought letters from leaders in the nuclear engineering field, who were asked to evaluate plaintiff's resume and publications and assess how he would fare at their institutions. Given the small size of the UT nuclear engineering program, the considerable passage of time since a prior nuclear engineering candidate had been put up for tenure, as well as the internal personality conflicts among the faculty in the program, seeking outside opinions from academicians familiar with plaintiff's field was objectively reasonable, and, if anything, more likely to lead to a fair result than not.

In item (8) Plaintiff maintains that all of the outside letters of reference should have been solicited from individuals selected by him. First, there is no evidence for this proposition. Indeed, a Fall 1998 memorandum to UT department heads places responsibility for developing a list of appropriate outside reviewers squarely with department chairmen and/or the Budget Council. While candidates may suggest names of possible reviewers, departmental officials "are not bound by the candidate's suggestions and shall select outside reviewers as they deem appropriate." Exhibit V at p. 6. Moreover, plaintiff's proposed list contained the names of research collaborators, former professors, and individuals who were associate rather than full professors, and failed to include "anyone from the top Nuclear programs in the country." Exhibit W. Under these circumstances, Dr. Landsberger's conduct in assisting with this administrative process was clearly objectively reasonable and, indeed, fell within the purview of his administrative duties as Area Coordinator. See Exhibit K, p.1.

Finally, item (9) is identical to item (7) under Dr. Klein. Dr. Landsberger did not

"conspire" with anyone to change the tenure standards to be applied to plaintiff. Dr. Koen has

been on the faculty at UT for 32 years, and he testified at the grievance hearing that he would be

"disappointed if all or even a preponderance of articles were [in the TANS]." Exhibit B at 34. A

little later in his testimony he added, "I would be disappointed at any faculty member that

presented only Transactions of the American Nuclear Society." Exhibit B at 49. Dr. Wehring

testified that he voted "no" on plaintiff's tenure and that he was concerned that plaintiff lacked

any independent full length journal articles. Exhibit B at 109-11. Neither Dr. Koen nor Dr.

Wehring are defendants in this litigation. Dr. Klein has been on the UT faculty since the 1970s

and he testified regarding the expectation that a successful candidate for tenure in nuclear

engineering would have "several" "good quality long journal publications of two to three

authors." Exhibit B at 308-09. Dr. Lamb also has been with UT for decades, and he, too,

testified about the need for a successful tenure candidate to have written numerous full-length

(10-12 page) journal articles "of which approximately half should be either single authored or

with one doctoral student." Exhibit B at 567.

Neither Dr. Landsberger or any other defendant in this litigation "changed" the standards

for tenure. They were what they had always been. Unfortunately, despite receiving repeated

warnings from Dr. Landsberger, whose job was to build up the program, not to lose faculty and

students, plaintiff flatly refused to take anybody's advice and made no effort to submit articles

for publication until it was too late for them to have been accepted in time for consideration in

the tenure process.

In sum, none of Dr. Landsberger's conduct was objectively unreasonable, nor would a

reasonable Area Coordinator tasked with building up the nuclear engineering program at UT

have had any reason to believe that any of his actions violated plaintiff's clearly established rights under either the First Amendment or 42 U.S. C. § 1981. Dr. Landsberger is therefore entitled to dismissal of this suit based upon qualified immunity.

### Dr. Lamb

Plaintiff's complaint attributes less allegedly ill motivated conduct to Dr. Lamb than he does to either Dr. Klein or Dr. Landsberger. Indeed, some of the actions that Dr. Lamb unquestionably took have been wrongly attributed to Dr. Klein, apparently in order to bolster plaintiff's sagging First Amendment retaliation claim. To the extent that Dr. Lamb in fact participated in any of the activities mistakenly attributed to others in plaintiff's complaint, the discussion of the objective reasonableness of those actions with respect to those others applies equally to Dr. Lamb.[42]

In paragraphs 4.31 and 4.34, and 4.35 plaintiff alleges that Dr. Lamb:

1.　Instructed plaintiff not to submit research grant proposals and not to recruit or accept new graduate students;
2.　Conspired with defendants Klein and Landsberger to apply different tenure standards to plaintiff; and
3.　Recommended against plaintiff's tenure application.

At this point these actions require little additional explanation; the objective reasonableness of items (1) and (3) has already been discussed, as has the utter dearth of evidence in support of item (2). Moreover, as discussed supra, Dr. Lamb was unaware of

---

[42] For example, Dr. Lamb has testified as to his involvement in the decision to solicit evaluations of plaintiff from leading nuclear faculty at other institutions in late 1997. This subject has been discussed already in connection with Dr. Klein (item 6) and Dr. Landsberger (item 7). In particular, as Dr. Lamb's expertise lies in an area of mechanical engineering other than nuclear engineering, obtaining the opinions of leading nuclear engineering faculty at other institutions was probably an excellent approach to getting an accurate assessment of plaintiff's qualifications given that plaintiff was refusing to listen to and so evidently resentful of Dr. Landsberger. See Exhibit BB, Statement of the Department Chair.

plaintiff's allegedly controversial January 1997 e-mail to the ANRC, thus retaliation on that basis would not have been possible. As chairman of the ME department, which contained six separate areas, it was reasonable for Dr. Lamb to rely upon the advice and assistance of the respective area coordinators, including Dr. Landsberger, particularly as Dr. Lamb's expertise was not in nuclear engineering. Thus Dr. Lamb is entitled to dismissal based upon qualified immunity as to all of plaintiff's claims.

### Ben G. Streetman and Sheldon Eckland-Olson

Plaintiff's only mention of these defendants is in paragraph 4.38 of his complaint, in which the two are alleged to have been "fully aware" of the "intentionally discriminatory and retaliatory conduct by Defendants Klein, Landsberger and Lamb" and to have "adopted" these allegedly unlawful practices. First, of course, there was no such discrimination or retaliation of which to be aware. Second, assuming *arguendo* that there was, both defendants have stated under oath that they had no knowledge, either at the time they reviewed plaintiff's tenure application file or since, of any discrimination by defendants Klein, Landsberger, or Lamb and were likewise, at the time they reviewed plaintiff's tenure file, unaware that he had complained or claimed to have complained about any aspect of the ANRC's operations. Exhibits DD, FF, GG.

Moreover, there was a clear break in the chain of events at the College Committee level. Six individuals, one representative from each of the six engineering departments, reviewed all of the tenure applications, including plaintiff's. Each professor was tasked with particular responsibility for a group of applicants, and Professor Carey Graham, representing the Department of Aerospace Engineering, was assigned to read and report on plaintiff's tenure

-38-

dossier. Dr. Graham, who is not a defendant, testified at the grievance hearing that he reviewed plaintiff's resume, his articles, and his teaching evaluations in order to form his own judgment prior to reading any of the Budget Council statements (which were written by Drs. Landsberger and Wehring). Exhibit B at 429-30. He observed that he had never seen teaching scores as low as those plaintiff had received from UT undergraduate students and that he recommended against tenure.

Thus, by the time plaintiff's tenure application reached defendant Streetman, if there had been any discrimination or retaliation at play, any alleged discriminatory or retaliatory "taint" from any actions by defendants Lamb, Landsberger, and Klein had become attenuated by virtue of the independent review conducted by individuals who did not really know plaintiff. The actions of defendants Streetman and Eckland-Olson in taking plaintiff's tenure package at face value, relying upon the information it contained, as well as drawing their own conclusions as to plaintiff's unfitness for tenure were, therefore, manifestly reasonable, and they are entitled to dismissal based upon qualified immunity.

### Neil Armstrong

Associate Dean for Academic Affairs Armstrong played no role at all in the tenure decision. He did not review plaintiff's tenure file, did not participate in any discussions about it, and did not vote upon it. See Exhibit EE. Moreover, he had and continues to have no knowledge of any discrimination or retaliation against plaintiff. He is entitled to dismissal based upon qualified immunity.

### President Faulkner

The only mention of President Faulkner appears in paragraph 4.39 of the complaint,

wherein he is alleged to have been aware of and to have adopted the discriminatory and retaliatory conduct of defendants Lamb, Landsberger, and Klein. As noted above, first there was no discrimination or retaliation of which to be aware. Second, if there were such discrimination and/or retaliation, President Faulkner was not aware of it. Exhibit DD. Given plaintiff's lack of qualifications for tenure, as well as the adverse recommendations of the ME Budget Council, ME chairman Lamb, the College Committee, and Dean Streetman, President Faulkner's decision to deny tenure to plaintiff was objectively reasonable. No one in President Faulkner's position would have had any reason to believe that denying the tenure application of such an obviously unqualified candidate violated any clearly established constitutional rights, and President Faulkner is entitled to dismissal based upon qualified immunity from all of plaintiff's claims.

### IV. Plaintiff Cannot Prevail On A Claim Under Title VI

Plaintiff's claim that he was denied tenure due to race discrimination should have been brought under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e et seq. In Lakoski v. James, 66 F.3d 751, 755 (5th Cir. 1995), cert. denied, 519 U.S. 947 (1996), our circuit held that Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination. The rationale was that the integrity of Title VII's administrative exhaustion requirement would be utterly frustrated if litigants could simply end run Title VII by alleging employment discrimination claims against educational institutions under Title IX.

In Lowery v. Texas A & M University System, 117 F.3d 242, 247 (5th Cir. 1997), the court implied a private right of action for a claim of retaliation arising under Title IX. In so doing, the court carefully differentiated between "allegations that would support a private cause

of action for retaliation under Title VII," which were barred under <u>Lakoski</u>, from allegations of retaliation that would be actionable only under Title IX. Moreover, citing <u>Lakoski</u>, the court declared, "we have previously held that Title VII provides the exclusive remedy for allegations of employment discrimination in federally funded educational institutions." 117 F.3d at 247-48.

Obviously, plaintiff cannot employ Title VI to complain that defendant UT's failure to promote him to the tenured position of Associate Professor was discriminatory. That would be precisely the type of garden variety employment discrimination claim barred under <u>Lakoski</u>.[43]

Cognizant of the holding in <u>Lakoski</u>, in his Unopposed Motion for Reconsideration of Dismissal of Claims (Motion), plaintiff attempts to exploit the "retaliation" loophole identified in <u>Lowery</u> by implying that plaintiff has a claim for retaliation for opposing a violation of Title VI. Motion at 2-3. To date, the violation of Title VI that plaintiff ostensibly "opposed' remains a mystery.

> Title VI provides that:
>
> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. If plaintiff is suggesting that his solitary e-mail directed to Dr. Adams and copied to Dr. Klein and the ANRC employees is the "opposition" in question, then his Title VI claim is dead on arrival. As discussed at great length <u>supra</u>, the subject of that e-mail is "budgets;" it deals solely with a budget cut affecting all researchers in plaintiff's joint project with several (Caucasian) faculty members of Texas A&M and plaintiff's hope that his future

---

[43] Paragraph 5.3 merely reads: Claims are made against The University of Texas at Austin on the basis of acts of defendants, accomplished through delegation of authority from The University of Texas at Austin, and in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

budgets will not be changed after he has already made hiring commitments to graduate students/postdoctoral assistants. Even a Ouija Board would not enable one to divine "opposition" to some sort of racial/national origin discrimination in plaintiff's e-mail.

In its Order of July 26, 2001, this Court noted that while it was doubtful that plaintiff would be able to make out a prima facie case of discrimination under Title VI, it might be possible were he able to establish that he had been "retaliated against differently than other 'whistle blowers' on the basis of his race." If that is indeed plaintiff's burden, then he cannot meet it. Even assuming, *arguendo*, plaintiff were a whistle blower, defendants are aware of no "similarly situated" non Arab "whistle blowers" with mediocre credentials for tenure who nonetheless were granted tenure. Thus, plaintiff's "claim" under Title VI should be dismissed.

## CONCLUSION

For all of the foregoing reasons, defendants UT, Dale Klein, Larry Faulkner, SheldonEkland-Olson, Ben G. Streetman, Neal Armstrong, Sheldon Landsberger and J.ParkerLamb request the entry of summary judgment in their favor.

<div style="margin-left:40%">

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

JEFFREY S. BOYD
Deputy Attorney General for Litigation

</div>

TONI HUNTER
Chief, General Litigation Division

_____
LINDA A. HALPERN
Texas Bar No. 24030166
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
(512) 320-0667 FAX

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Motion for

Summary Judgment has been sent via certified mail, return receipt requested on 29 th day of

October, 2001 to:


David T. Lopez
David T. Lopez & Assoc.
3900 Montrose Boulevard
Houston, Texas 77006-4959


_____
LINDA A. HALPERN
Assistant Attorney General

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## NOTICE OF DOCUMENT(S) NOT IMAGED
## AND CONTAINED IN EXHIBIT FOLDER

Civil Case No.     A-00-CA-813 JN

NAEEM ABDURRAHMAN

VS.

THE UNIVERSITY OF TEXAS, et al

Attachments to
Document #:     31

Description:     Appendix to Defendant's Motion for
Summary Judgment

Filed By:     All Defendants

File Date:     10/29/01

_____
DEPUTY CLERK