FILED

NOV 1 3 2001

CLERK, U S DISTRICT COURT

BY _____ Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| NAEEM M. ABDURRAHMAN, | ∫ |
| | ∫ |
| Plaintiff, | ∫ |
| | ∫ |
| | ∫ |
| v. | ∫     Civil Action No. A-00-CA-813 JN |
| | ∫ |
| THE UNIVERSITY OF TEXAS, DALE E. | ∫ |
| KLEIN, LARRY R. FAULKNER, | ∫ |
| SHELDON EKLAND-OLSON, BEN G. | ∫ |
| STREETMAN, NEAL E. ARMSTRONG, | ∫ |
| SHELDON LANDSBERGER and | ∫ |
| J. PARKER LAMB, | ∫ |
| | ∫ |
| Defendants. | ∫ |

## PLAINTIFF ABDURRAHMAN'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Naeem M. Abdurrahman, plaintiff, opposes herein the defendants' motion for summary

judgment (Def. M.S.J.).

## INTRODUCTION

Giving any consideration to the defendants' motion for summary judgment would constitute

approval by the court of wilful disregard of the rules and a gross abuse of process by the defendants.

Defendants, on the last day allowed in the scheduling order for dispositive motions, present

a motion of more than 40 pages, accompanied by hundreds of pages of exhibits. They declare in

their motion that "discovery has now concluded." Def. M.S.J. at 2.

37

The motion for summary judgment raises the defense of qualified immunity and seeks summary judgment asserting "there remains no evidence whatsoever that the denial of plaintiff's tenure application resulted from anything but legitimate considerations."

Local Rule CV-12 requires that in any case arising under 42 U.S.C. § 1983, any parties asserting the defense of qualified immunity "shall file a motion to dismiss or for summary judgment in their initial pleading or within thirty calendar days of their initial pleading." After such a motion is filed, the plaintiff has eleven days to respond, specifying what discovery is necessary.

Defendants filed their answer on March 12, 2001, Docket No. 3. They did not move to dismiss or for summary judgment on the Rule 11 defense, either with their answer or within 30 days thereafter. With their answer, however, they moved to stay discovery, Docket No. 4, and ten days later, on March 22, 2001, the court granted the motion to stay discovery, except on the issue of qualified immunity, until the court ruled on qualified immunity. Docket No. 8.

Because the defendants did not file a motion to dismiss or for summary judgment on the qualified immunity defense until the deadline for dispositive motions, the court, of course, has not ruled on qualified immunity, and plaintiff has been barred from plenary discovery.

Amazingly, defendants attempt to impose on plaintiff their default, suggesting that the plaintiff should have sought an order enlarging the scope of discovery, Def. Reply to Pl. Comments, etc., Docket No. 35, at 2. Defendants also claim there is no prejudice to plaintiff, even though they concede the court directed the parties to be ready for trial on November 12. As shown below, those arguments are meritless, and the court should give no consideration to the qualified immunity defense. Nor should the court permit the defendants to belatedly present facts which could have been challenged by plenary discovery if timely presented.

To the extent that the court might consider any part of the motion for summary judgment, the motion nevertheless must be denied. Defendants' challenge to the plaintiff's qualifications rests on inadmissible hearsay, and the asserted deficiency in publications is well controverted and presents ultimate fact issues of motivation and pretext to be determined by the jury.

## THE SUMMARY JUDGMENT STANDARDS

Movants for summary judgment bear the burden of demonstrating that there is no genuine issue as to any material fact and that each movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Where the issue of motivation is involved, establishing entitlement to summary judgment is particularly difficult, as the Fifth Circuit has held both before and after the Supreme Court's trilogy on summary judgment. "Determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore particularly within the province of the fact-finder....Thus, if any facts are in dispute, summary judgment generally is inappropriate." *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 641 (5th Cir. 1985); *Honoré v. Douglas*, 833 F.2d 565, 569-70 (5th Cir. 1987) (Summary judgment is ill-suited for determination of credibility and nebulous questions of motivation.)

In considering a motion for summary judgment, the court "must indulge every reasonable inference from [the underlying] facts in favor of the party opposing the motion." *Thornbrough,* 760 F.2d at 640; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 547, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Evidence before the court cannot be dismissed as not believable. *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987). Only after drawing all reasonable inferences in favor of the non-movant can the

court determine whether the evidence in the record is such that no reasonable juror could find in favor of the non-movant, thus entitling the movant to judgment. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089 (5th Cir. 1995)(citing *Liberty Lobby*).

## ISSUES PRESENTED

1. May defendants raise their qualified immunity defense in plain violation of the Local Rules, and, if so, is there any issue of material fact as to whether the conduct of each defendant was objectively reasonable in accordance with clearly established law?

2. Is there any issue of material fact as to whether the plaintiff spoke out on a matter of public concern and whether such expression was a motivating factor in his being denied tenure and terminated?

3. Is there any issue of material fact as to whether plaintiff's race was a motivating factor in his being denied tenure and terminated?

4. Is there any issue of material fact as to whether plaintiff was retaliated against more sternly than other individuals making complaints concerning the operation of a federally funded program?

## GENERAL OBJECTIONS TO DEFENDANTS' STATEMENT OF FACTS

Defendants present a statement of facts which largely is conclusory and self-serving, ignores controverting evidence and is not supported by summary judgment evidence of record. Plaintiff specifically objects to the consideration of any exhibit which is not sworn or certified as required by Rule 56(e), Fed.R.Civ.P., except those referred to in this response, those being documents which were authenticated in the hearing before the Faculty Grievance Committee.

Because separate issues raised in the motion for summary judgment concern particular sets of facts, plaintiff presents and discusses the facts presented by the summary judgment evidence below in connection with the independent arguments on the issues.

The general framework of the dispute is clearly evident. Plaintiff was denied tenure at the completion of his entire probationary period, and he claims the tenure decision was motivated by his complaints regarding a federally funded program in which he conducted most of his research and by racial discrimination against him as an Arab Muslim.

## ARGUMENT AND AUTHORITIES

### 1.

### The Qualified Immunity Argument Is Untimely

The applicable local rule is clear and was violated.

A motion for summary judgment raising the qualified immunity defense must be filed with a party's original pleading or within 30 days after that pleading. Defendants filed their answer on March 12, 2001, and their motion for summary judgment on qualified immunity on October 29, 2001, more than six months later.

The local rule is consistent with and must be interpreted in accordance with plain Supreme Court authority:

> Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Ibid.* As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

*Saucier v. Katz*, ___ U.S. ___, 121 S.Ct. 2151, 2155-56 (2001).

Neither applicable law, nor the local rule, can be read to countenance a party's moving on the summary judgment defense on the last day possible in the docketing order, two weeks before the date the parties are ordered to be fully ready for trial.

Defendants cannot shift the blame for their default either to the court or to the plaintiff.

With their answer, Docket No. 3, defendants moved to stay discovery, Docket No. 4, and to require a Rule 7 reply by the plaintiff, Docket No. 5. Plaintiff promptly responded to both motions, Docket Nos. 6 and 7, and the court made its ruling on March 22, 2001, only 10 days after the filing of the answer. Docket No. 8. Defendants had ample time to move on the qualified immunity defense within the time provided in the local rule.

Nor can defendants seek refuge in the court's order staying discovery. Rendered only 10 days after the filing of the answer, that order certainly did not countenance a stay of discovery beyond the time for dispositive motions. Defendants' attempt to burden the plaintiff with the responsibility for enlarging the time for plenary discovery is unavailing. Any failure to seek such enlargment might relate to plaintiff's opposition herein to other parts of the summary judgment motion. In no way does it excuse defendants' default, nor waive plaintiff's reasonable reliance on the Local Rules.

In fact, the Local Rule CV-12 specifically imposes on the defendants the obligation to define the scope of the qualified immunity defense so that the plaintiff can determine what discovery, if any, is necessary.

That plaintiff served discovery within the limit set by the court in no way diminishes the prejudice caused by defendants' default. Even though defendants did not timely move on the qualified immunity defense pretrial, plaintiff had to prepare, as best he could, for the possibility of the defense being raised at trial. Not being informed with respect to the scope of the defense, as

envisioned by the local rule, plaintiff was required to make broad inquiries of the defense. In response, defendants refused to admit plaintiff is of a race other than White, and they objected to inquiries regarding plaintiff's right to speak on issues of public interest and the individual defendants' knowledge of the law applicable to the right to free expression and to be free of invidious discrimination. So, not only did the defendants not disclose the scope of their defense, they objected to plaintiff's attempts to discover it.

The substantial prejudice to the plaintiff from defendants' default is clearly evident.

1. Plaintiff was barred from directing discovery on qualified immunity to the scope of the defense asserted.

2. Plaintiff was barred from discovery on issues other than qualified immunity.

3. Plaintiff, contesting the loss of his faculty position resulting in his being unemployed for more than one year, was faced with the choice of proceeding with defending against the motion as best he can, or asking for opening of discovery, which would cause additional delay and preclude the case proceeding expeditiously to trial.

4. If now the court rules on the qualified immunity defense on the merits, defendants, as have other State officials represented by the Texas Attorney General, will file an interlocutory appeal. The filing of such an appeal after the case is fully ready for trial would impose unconscionable hardship on the plaintiff.

The prejudice from untimely assertion of the qualified immunity defense has been clearly recognized. "The potential for abusive delays or manipulative uses of qualified immunity claims is clear, as a defendant can raise the defense at various stages of litigation and a denial of the defense at any of these stages generally entitles a defendant to an immediate appeal." *Skrtich v. Thornton,*

2001 WL 1159774 (11ᵗʰ Cir., No. 00-15959, decided Oct. 2, 2001), quoting *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir.1994). Untimely assertion has been repeatedly held to be a waiver of the qualified immunity defense, at least at the pretrial stage. See, e.g., *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664 (1st Cir.1996); *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir.1989)(Qualified immunity defense is forfeited by untimely motion.); *Jones v. Wells*, 989 F.2d 493, 1993 WL 61892 *1 (4ᵗʰ Cir. 1993) ("The fact that qualified immunity if proved is an "immunity from suit," *Mitchell v. Forsyth*, 472 U.S. 511 (1985), does not render unnecessary timely pleading.).

The discretion of a trial court to deny a summary judgment motion arguing qualified immunity because it is untimely under the local rules specifically has been upheld. *McElroy v. City of Macon*, 68 F.3d 437 (11th Cir. 1995).

A district court's discretion to deny a motion for summary judgment raising the qualified immunity defense because the movants did not comply with time limits set by the court has been upheld, even when no trial date was set. "Such empowerment not only permits the court to grant firm trial dates, but also permits it to group dispositive motions, forecast the likely effect of interlocutory appeals, and otherwise ensure that a case moves forward in a logical, reasonably expeditious progression. Litigants could complicate exponentially the efficacious management of crowded dockets if left free to engage in the kind of dilatory behavior exhibited by the appellants as long as no firm trial date was in prospect." *Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 316 (1ˢᵗ Cir. 1998).

Defendants do not attempt to justify their default. Instead, they claim that they timely asserted the qualified immunity defense. That is not sufficient to overcome the default under the authorities above cited. Local Rule CV-12 does not impose a time limit on presenting the qualified

immunity defense. Indeed, the defense, like any other affirmative defense, must be included in the answer. *Gomez v. Toledo*, 446 U.S. 635, 639-641 (1980). The rule specifically sets a time limit for presenting the defense in a motion to dismiss or for summary judgment. Defendants missed that limit by some six months. The motion for summary judgment, insofar as it seeks to present the qualified immunity defense, is untimely, and that defense cannot be considered.

**2.**

## No Defendant Is Entitled to Qualified Immunity

The individual defendants, each of whom has a Ph.D. degree and years of experience in university teaching or administration, feign ignorance of First Amendment principles which would not confuse an entering freshman at The University.

First, they claim they could not know they were violating Dr. Abdurrahman's rights to free expression because they assumed that a public employee is not entitled to speak out on matters which do not concern the employee personally, but are related to the employee's duties.

Second, they claim they could not know they were violating Dr. Abdurrahman's rights to free expression because they did not understand Dr. Abdurrahman to be speaking out about wrongdoing or mismanagement.

There is no possible controversy as to the clearly established law, and the general perimeters are recognized in the defendants' motion. A public employee's expression may relate to a public concern "if it does not involve solely personal matters" and is not "made in furtherance of a personal employer-employee dispute." Def. M.S.J. at 16, quoting from *Kennedy v. Tangipahoa Parish Library Board of Control*, 22sd4 F.3d 359, 372 (5th Cir. 2000).

The basic principles are not difficult to understand. Citizens have a constitutionally protected right to free expression under the First Amendment. To be protected, expression must concern matters of interest to the public, not purely personal matters. Public employees are best able to inform the public about wrongdoings and problems which directly involve their daily work. Accordingly, expression by public employees which concerns aspects of their employment is fully protected, so long as it is not limited to purely personal concerns or grievances.

The direction of the law has been clear in the Fifth and other circuits. See, for example, *Wilson v. The University of Texas Health Center*, 973 F.2d 1263, 1269 (1992)("But practically such a rule would permit public employers to remove constitutional protection from speech on certain subjects by including those subjects within employees' reporting duties.") See, also, *Warnock v. Pecos County*, 116 F.3d 776, 780 (5th Cir. 1997) (Defendants' contention that auditor's reports of improper practices were not protected because it was her job to investigate government waste and abuse rejected.), citing *Wilson* and other authority; *Brawner v. City of Richardson*, 855 F.2d 187, 191-92 and fn. 10-14 (Distinction is between speech concerning personnel policies and that concerning public official misconduct; the latter is protected.); *Burnham v. Ianni*, 119 F.3d 668, 679 (8th Cir. 1997) (As defined in *Connick v. Myers*, 461 U.S. 138 (1983), many types of speech are protected, excluding mainly speech relating merely to internal office grievances.); *Hulbert v. Wilhelm*, 120 F.3d 648, 653 (7th Cir. 1997)(Test is whether speech would be protected if uttered by a private citizen and whether the speech was more than an unprotected personal employee grievance.) In fact, after *Connick*, the Supreme Court has spoken on the issue: "Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Waters v. Churchill*, 511 U.S. 661, 674

(1994), citing to *Pickering v. Board of Ed. Of Township High School Dist.*, 391 U.S. 563, 572 (1968).

As is shown in more detail below, the plaintiff spoke out on matters related to the funding and accounting of a federally funded project, and his concerns were not purely personal, but were shared by faculty at Texas A&M University. Each individual's conduct, as affected by an impermissible retaliatory motive, also is discussed in more detail below.

As to the racial discrimination claims and retaliation claims, the law similarly is clearly established. In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987), the United States Supreme Court upheld a claim under 42 U.S.C. § 1981 by an Arab Muslim claiming discrimination in the denial of tenure.

That each of the defendants denied in response to discovery that plaintiff was at times material to this action considered of a race other than White for purposes of his claims significantly emphasizes the importance of the court's adhering to the well established rule that in determining the motion for summary judgment the court must give credence to plaintiff's evidence and the inferences to be drawn therefrom.

**3.**

### There Are Material Issues of Fact on the First Amendment Claim

**A. Plaintiff Spoke on Matters of Public Interest**

Defendants characterize Dr. Abdurrahman's statements as "those of a junior manager to senior management regarding the size of his proposed budget." Def. M.S.J. at 16. They argue that consequently Dr. Abdurrahman was speaking "not at a citizen, but as a participant in a work related process that directly affects him." *Id.*

That plainly is a mischaracterization of the facts. As defendants well know from Dr. Abdurrahman's deposition, the complaints were not those of Dr. Abdurrahman alone, but also of faculty at Texas A&M University, and they involved not the size of their budgets, but the insistence by Defendant Dale E. Klein and the Amarillo National Resource Center for Plutonium (ANRCP–also referred to as ANRC, as in Def. M.S.J.) that all research funding, however obtained, be channeled through the ANRCP.

As defendants note, the ANRCP was established after the United States Department of Energy decided to consolidate all nuclear weapons production and decommissioning at Amarillo, Texas. Def. M.S.J. at 4. The ANRCP was to conduct scientific and technical research on nuclear weapons, the plutonium material in the weapons, and related issues. *Id.* Defendants concede that the mission of the ANRCP was a matter of public interest. Def. M.S.J. at 16.

Efforts by Defendant Klein and others at the ANRCP to monopolize all research funding in an area of major impact on public security and health cannot be dismissed as insignificant or routine. Certainly the ability of research scientists and engineers to pursue their research with reasonable independence and freedom is of more than passing public interest. The efforts of the ANRCP were not confined to Dr. Abdurrahman, nor based on advancement of the public interest. When the two Texas A&M faculty members with whom Dr. Abdurrahman had been communicating on the issue informed ANRCP they were unwilling "to cede to Center staff the authority, exclusive or otherwise,

to represent us in discussions with possible third-party funding sources," Exh. 1, attached[1], they were told those conditions were unacceptable and ANRCP funding was withdrawn, Exh. 2, attached.[2]

The ANRCP position was not just a matter of accounting practices, or about who would get the credit for research grants. The ANRCP attitude was a serious concern for the researchers, who believed they had to seek other funding sources, due to to the ANRCP lack of commitment to stable funding. See Dr. Adams's e-mail message to Dr. Abdurrahman in Exh. J to Def. M.S.J. In that context, Dr. Abdurrahman first raised his concerns in January, 1997, *Id.,* with copies to ANRCP leaders and decision makers, *Id.* A very significant piece of evidence about which defendants inquired at Dr. Abdurrahman's deposition understandably was not deemed by defendants as worthy of being presented to the court. In response to Dr. Abdurrahman's memorandum mentioning that copies went to top ANRCP managers, including Defendant Klein, Dr. Adams perceptively noted on January 31, 1997: "Sending a copy to the ANRCP powers was a bold move! I'm glad you did it, and I hope you don't get 'in trouble' for it. (Come to think of it, what can they do to you that's worse than what they've already done!?) It will be very interesting to see how they respond..." Exh. 3, identified and verified as Exh. 9 to Dr. Abdurrahman's deposition.

## B. The Speech Was a Substantial Motivating Factor in Adverse Actions

Dr. Adams's concerns were prescient. Dr. Abdurrahman did get in trouble.

In the same month as his original e-mail, January, 1997, Dr. Abdurrahman was removed from the position of area coordinator of the nuclear program at The University of Texas, a position he had

---

[1] This letter from Dr. Marvin L. Adams and Dr. Paul Nelson of the Texas A&M University nuclear engineering faculty, dated Nov. 14, 1997, to the ANRCP nuclear programs manager, was identified and verified as part of Exh. 5 to Dr. Abdurrahman's deposition.

[2] The response, December 2, 1997, from the ANRCP nuclear programs manager, was identified and verified as the other part of Exh. 5 to Dr. Abdurrahman's deposition.

held since joining the faculty, Abdurrahman Depo, Exh. 4 attached, at 92. He was replaced by Defendant Sheldon Landsberger, *Id.*, at 91, Def. M.S.J. at 6. Initially, Dr. Landsberger was an adjunct faculty member, and three months after his hiring, and even before he relocated to the campus, he attacked Dr. Abdurrahman in a report. Def. M.S.J. at 6,7, and Exh. M ("I believe Naeem is in serious trouble to be promoted and tenured given his current weak publication record.")

Dr. Landsberger based his negative opinion of Dr. Abdurrahman's publication record solely on a review of the annual reports of the Nuclear Engineering Teaching Laboratory. Dr. Abdurrahman's research activities of the period, as shown in the annual reports of the department, are attached hereto as Exh. 7. They are listed under the general section "Refereed Archival Journals," the same as those of other faculty. Whether Dr. Abdurrahman's publications properly were given lesser consideration than those of other faculty listed in the same section is an issue in controversy which the jury must determine in considering whether the defendants' motivation was *bona fide* or pretextual. See, e.g., *Curry v. Menard, Inc.*, 2001 WL 1315063, *3-4 (7th Cir., No. 00-4219, decided Oct. 31, 2001).

A number of other examples of mistreatment were summarized by Dr. Abdurrahman in his deposition, Exh. 4 attached, pp. 88-89:

> I was deprived from office space in the lab. I was pushed around from one office to another for a very short period of times, and eventually being evicted from there, although I had experimental work that was going on. And there was interference in my funds by other faculty as to how they should be spent, and...even before [the dispute about start-up funds], Dr. Landsberger started looking into my accounts and getting information from the secretary as to what I have and what I don't, and this and that, which was not a typical practice of another colleague to do those things...He was talking to my students and offering them other opportunities to work with other people and to –sort of scaring them that I would not be getting tenure, it's too risky for them to stick with me. The position that I was put in when that particular ANRCP award was retracted and I was blamed later on by Dr. Klein that–that I

overcommitted myself, did not manage my funds properly, although it was not my mistake that that work or that grant was withdrawn...

Other faculty would not agree to submit proposals for research with Dr. Abdurrahman because they believed that Dr. Abdurrahman's involvement would insure that the proposal would not be funded. *Id.* at 89. Dr. Abdurrahman was told that Defentant Klein's position was that if Dr. Abdurrahman's name was on a proposal to the ANRCP, it would not be funded. *Id.* at 85.

Dr. Abdurrahman also summarized the adverse actions against him in his statement of greivance to the faculty grievance committee. Def. M.S.J. Exh. A.

That the adverse actions were connected to Dr. Abdurrahman's speaking out with respect to budgeting and the forcing of research grants into the ANRCP is sufficiently demonstrated by the actions which followed Dr. Abdurrahman's statements, independently and with other faculty.

Although Dr. Abdurrahman did not sign the letter sent by Dr. Adams and Dr. Nelson, Dr. Abdurrahman did discuss with Drs. Adams and Nelson the substance of the letter before it was mailed, Abdurrahman Depo., Exh. 4 attached, at 40, and Dr. Abdurrahman previously had been closely associated with Drs. Adams and Nelson.

When the funding was withdrawn after the letter from Drs. Adams and Nelson, Dr. Abdurrahman did not have sufficient funds to compensate a post-doctoral fellow, Musa Yavuz, *Id.,* whose appointment Dr. Abdurrahman had extended in expectation of the grant funding. Adbdurrahman Depo., Exh. 4, attached, at 41. Dr. Abdurrahman arranged to have funding from overhead allotments his research grants had provided to the Nuclear Engineering Teaching Laboratory, *Id.* at 41-42. In his capacity as vice chancellor, Defendant Klein overruled the laboratory director, Dr. Bernard Wehring, and directed that payment be made from a fund under Dr. Abdurrahman's direct control. Exh. 5, attached, identified and verified as Exh. 6 to Dr.

Abdurrahman's deposition. Dr. Abdurrahman's protest led to a series of electronic mail messages, which culminated in one from Defendant Klein with a strong threat: "If you send one more e-mail about this issue, all your current and future funding from the ANRCP will be re-evaluated by me personally. I do not care to have a faculty member with the attitude you are demonstrating associated with either the Center or the Nuclear Program." Exh. 10, attached, identified and verified as Exh. 7 to Dr. Abdurrahman's deposition.

Before Dr. Abdurrahman went through the formal process of consideration for tenure, Dr. Landsberger sought evaluation from scholars outside the University. Report of Faculty Grievance Committee, Def. M.S.J., Exh. B at p. 5. After receiving negative evaluations, Dr. Landsberger and Defendant Parker Lamb, as department chair, asked the same individuals for external evaluations, knowing that they would be negative. *Id.* In fact, one of the individuals submitted the same letter twice. *Id.* Although the grievance committee did not find any procedural error or violation of Dr. Abdurrahman's rights[3], the committee noted it was troubled by the use of the same evaluators prior to and during the formal promotion and tenure process and recommended that The University adopt a policy forbidding such a practice. *Id.* at p. 6.

That the actions of Defendants Klein and Landsberger had a direct effect on Dr. Abdurrahman's being denied tenure is supported by the evidence.

In preparation for Dr. Abdurrahman's application for promotion and tenure, Defendant Lamb, the department chair, met with Dr. Abdurrahman and specifically informed Dr. Abdurrahman that Dr. Abdurrahman's research productivity was "at a level which is consistent with recent candidates."

---

[3] Whether or not Dr. Abdurrahman properly was denied promotion and tenure was not an issue before the committee. *Id.* at p. 3.

Grievance Hearing Transcript, Exh. 6, attached, at 94 and Def. M.S.J. Exh. Q, attached, identified by Dr. Abdurrahman at the hearing, p. 94. By the time of formal consideration of promotion and tenure for Dr. Abdurrahman, however, Dr. Landsberger had sought the negative evaluations, and Dr. Lamb had radically changed his position on Dr. Abdurrahman's research. Exh. 8, attached. Dr. Lamb, in his statement regarding promotion and tenure blatantly refutes his very own previous statement: "His record of publication is quite different from that of the usual junior faculty members during a probationary period." Def. M.S.J., Exh. BB. The jury certainly can find such prevarication as strong evidence of improper motivation.

Criticism of the journal in which Dr. Abdurrahman's research was published not only is belied by Dr. Lamb's statement to Dr. Abdurrahman, but also by the fact that the journal was listed by the Dean of Engineering as one of the premier journals in which department faculty could publish. *Id.* at 94-95. At the very least, the evidence supports a finding that Dr. Abdurrahman fully met the expectations of The University, as communicated to him.

Defendants quote Dr. Lamb as stating that Dr. Abdurrahman was listed as one of the three worst teachers encountered by students in the Mechanical Engineering Department, Def. M.S.J. at 12 and Exh. BB thereto. Dr. Lamb's statement is inadmissible hearsay to prove the truth of the averment, particularly because Dr. Lamb characterizes Dr. Abdurrahman's teaching generally as never ranking much above the average for the department. Def. M.S.J. Exh. BB. That, of course, is a statement that Dr. Abdurrahman was ranked above average for the department, even if by not much. Again, there is evidence from which the jury can find unlawful motivation.

Defendants also seek support in the testimony of Dr. Bernard Wehring at the grievance hearing, to the effect that he voted against tenure for Dr. Abdurrahman. The jury can and should

consider the statement by Dr. Wehring, admitting that he told Dr. Abdurrahman that Dr. Klein and Dr. Landsberger were strongly opposed to Dr. Abdurrahman and that Dr. Wehring was not in a position to oppose or contradict them. Grievance Hearing Transcript, Exh. 6, attached, at 114.

All of the other defendants had direct participation in the decision not to promote and tenure Dr. Abdurrahman, and all ranked below Dr. Klein's position as chancellor. The departmental recommendation went to Defendant Ben G. Streetman, Dean of the College of Engineering and Defendant Neal E. Armstrong, Associate Dean for Academic Affairs; thence to Defendant Sheldon Eckland-Olson, Provost; and finally to Defendant Larry Faulkner, President. Each of them had the opportunity to fully review the application for promotion and tenure and to be fully aware of the gross departures from fair consideration of Dr. Abdurrahman's research. President Faulkner, additionally, had the opportunity and responsibility to be fully aware of the record produced in the grievance hearing.

Given Dr. Klein's strong opposition to Dr. Abdurrahman, directly tied to Dr. Abdurrahman's protected expression, the jury must be allowed to determine the extent to which that opposition adversely affected Dr. Abdurrahman's application for promotion and tenure.

### 4.

### There Are Material Issues of Fact on the Racial Discrimination Claim

As shown in detail in the preceding section, Dr. Abdurrahman was treated differently from other applicants for promotion and tenure, resulting in his denial of tenure and termination. Specifically, he was not given credit for publication in a journal which had been listed as a premier journal for faculty research publications in the Department of Engineering, and he was subjected to

a biased external evaluation in a manner which a faculty grievance committee found troubling and improper.

Defendants assert that plaintiff cannot show that he was qualified for the position he sought. Defendants attempt to rely on the inadmissible hearsay regarding Dr. Abdurrahman's teaching, Def. Mot. at 19, which itself is inconsistent with the department chair's statement that Dr. Abdurrahman's teaching was above average. Defendants further attempt to rely on an asserted inadequate publication record based on the assertion that the type of Dr. Abdurrahman's publications and the journal in which they were published was not worthy of credit. *Id.* There is evidence to rebut that contention, however, and Dr. Abdurrahman is entitled to have that evidence credited, as shown above. Holding Dr. Abdurrahman to the very criteria which he claims were discriminatory, however, makes no sense, as a matter of law. See *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 612 n. 3 (7th Cir.2001) (Qualifications prong of the prima facie test does not apply where the people judging the plaintiff's performance were the same people accused of discrimination.)

As shown above, where motivation and intent are a central issue, summary judgment generally is not proper. See, also, *Huhn v. Koehring Co.*, 718 F.2d 239, 242 ("Summary judgment is improper in a discrimination case--or any other--if it involves--as it often must--any weighing of conflicting indications of motive and intent."), quoting *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1218 (7th Cir.1980). In *Huhn*, as suggested in *Curry, supra*, the court treated the employer's challenge of qualifications as articulation of a non-discriminatory motive, leaving the disposition of the case to the issue of pretext.

Determinations on faculty tenure necessarily are subjective, as in this case. Where there is, as here, departure from the norm, or prior practice, however, the court should be particularly mindful

of the recognized potential to use subjective measure of qualifications as a pretext for discrimination. *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681(5th Cir. 2001), quoting from *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980)(Employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process is challenged as discriminatory.)

Here, plaintiff has demonstrated that he is a member of a protected racial minority, with a name that readily identifies him as such, and that all of the defendants participated in denying him promotion and tenure applying criteria differently from that applied to other faculty. Although the defendants assert that Dr. Kline was not a participant in the denial of promotion and tenure, there is evidence to show otherwise, significantly Dr. Wehring's statement that his vote to deny promotion and tenure was in the context of not being able to oppose Dr. Kline.

### 5.

### There Are Material Issues of Fact on the Title VI Retaliation Claim

As has been shown above, from the outset, the racially discriminatory actions of Drs. Kline and Landsberger were directed not only at Dr. Abdurrahman, but also at Arab students within the department who were identified with Dr. Abdurrahman.

When Dr. Abdurrahman sought and obtained funding for Dr. Yavuz, a post-doctoral assistant, Dr. Kline intervened, and when Dr. Abdurrahman insisted on a fair method of compensating Dr. Yavuz, Dr. Kline threatened to personally "review" Dr. Abdurrahman's federal grants, see *supra* at p. 16, a thinly veiled threat to curtail Dr. Abdurrahman's research funding.

Dr. Landsberger attempted to persuade an Arab graduate student, Magdy Abdelrahman, not to work with Dr. Abdurrahman, made it clear that Dr. Landsberger did not like Mr. Abdelrahman,

and intevened to have Mr. Abdelrahman removed from employment at the computer laboratory, knowing that might preclude Mr. Abdelrahman from continuing his education. Grievance Hearing Transcript, Exh. 6 at 613-618. Mr. Abdelrahman complained to Dr. Abdurrahman that Dr. Landsberger hates Arabs and Muslims, Abdurrahman Depo., Exh. 4, attached, at 115. Dr. Landsberger similarly interfered with Dr. Yavuz, *Id.* at 114 and Dr. Mohamed Elsawi, who like Mr. Abdelrahman is from Egypt, *Id.* at 108. When Dr. Abdurrahman complained to Dr. Landsberger, Dr. Landsberger accused Dr. Abdurrahman of making libelous statements. Exh. 9, attached, electronic mail messages exchanged between Dr. Abdurrahman and Dr. Landsberger, which were identified and verified at the Grievance Hearing.

Previously, Dr. Abdurrahman has demonstrated that Drs. Kline and Landsberger were the primary movers in the events which resulted in denial of promotion and tenure to Dr. Abdurrahman. Both, of course, acted in their capacity as officials and agents of The University of Texas within authority delegated to them as a result of their positions.

Accordingly, there is a viable claim against The University of Texas under Title VI of the 1964 Civil Rights Act, and there are material issues of fact which preclude summary judgment on that claim.

In opposing defendants' motion to dismiss the Title VI claim on the grounds that it is preempted by Title VII of the 1964 Civil Rights Act, Dr. Abdurrahman demonstrated that while a claim of employment discrimination separate from Title VII is not actionable under Title VI, the same is not true for a claim of retaliation. *Lowrey v. Texas A&M University System,* 117 F.3d 242, 249 (Title IX claim of retaliation is not preempted by Title VII and a private right of action is viable for victims of discrimination in federally funded educational institutions.")

As the court noted in its order denying the motion to dismiss, the parties did not brief the issue of Title VI claims in sufficient details. Plaintiff respectfully suggests that the court's conclusion that Dr. Abdurrahman would have to show that he was treated differently from others complaining about the federally funded program is not precisely correct.

In *Lowrey* the court noted that it is important to distinguish between a cause of action for *discrimination* under Title IX and a cause of action for *retaliation* under that title. 117 F.3d at 251. The distinction has been discussed by other courts. Thus, there is no preemption when an employee of a federally funded program suffers retaliation as a consequence of opposition to noncompliance with the provisions of Title VI, that is for opposition to discriminatory practices in the federally funded program. See, *Blalock v. Dale County Board of Education*, 84 F.Supp.2d 1291, 1299 (M.D. Ala. 1999). Such opposition includes "merely voicing concerns to superiors within the university," *Legoff v. Trustees of Boston University*, 23 F.Supp.2d 120, 128 (D. Mass. 1998), citing authority.

There is evidence that Dr. Abdurrahman voiced concerns about the treatment of Arab students to the defendants who were most closely connected with his failure to be promoted and tenured. The motion for summary judgment must be denied as to the Title VI claim against The University of Texas.

## SUMMARY AND CONCLUSION

Defendants' motion for summary judgment lacks in substance what it presents in heft. Plaintiff made a prompt objection to exceeding the 25-page limit in the motion after defendants submitted a motion to exceed the limit without the conference required by the Local Rules. The court granted the motion at about the same time as the opposition was presented, within days of its filing, apparently viewing it as merely procedural. As shown above, not only did the defendants

exceed the limit by filing a motion in contravention with the Local Rules, but the raising of qualified immunity on the last day for dispositive motions, coupled with the motion to limit discovery, is a clear abuse of the court's procedures. The motion should be denied without consideration. The court should include in its order a statement that qualified immunity is denied as being untimely raised, in order to fully inform the appellate course in the event an interlocutory appeal is attempted.

Even if the court considers qualified immunity, it must be denied as to each of the defendants, and there are material issues of fact with respect to each of the claims presented by the plaintiff.

## PRAYER

Accordingly, plaintiff prays that the defendants' motion for summary judgment be denied in all respects, and that the court include in its order a statement that the motion is denied as untimely with respect to the qualified immunity defense.

Respectfully submitted,

David T. López
Attorney-in-Charge for Plaintiff
State Bar of Texas No. 12563000
3900 Montrose Boulevard
Houston, TX 77006-4959
Telephone: 713.523.3900
Telecopier: 713.523.3908
E-mail: dtlopez@lopezlawfirm.com

OF COUNSEL:

DAVID T. LOPEZ & ASSOC.

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing submission was served on this 10th day of November, 2001, on the attorney-in-charge for the respondent party or parties by placing it in the United States Mail, postage prepaid, addressed to the last known address as follows:

> Linda A. Halpern, Esq.
> Assistant Attorney General
> General Litigation Division
> Office of the Texas Attorney General
> P. O. Box 12548
> Austin, TX 78711-2548

_____
David T. López

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## NOTICE OF DOCUMENT(S) NOT IMAGED

Civil Case No.     A-00-CA-813 JN

NAEEM M. ABDURRAHMAN

VS.

UNIVERSITY OF TEXAS, et al

Attachments to
Document #:        37

Description:       Attachments to Plaintiff's Opposition to
                   Defendant's Motion for Summary Judgment

Filed By:          Plaintiff

File Date:         11/13/01

_____
DEPUTY CLERK