IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION



| | |
|---|---|
| NAEEM M. ABDURRAHMAN,<br><br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF TEXAS, DALE E. KLEIN, LARRY R. FAULKNER, SHELDON EKLAND-OLSON, BEN G. STREETMAN, NEAL E. ARMSTRONG, SHELDON LANDSBERGER and J. PARKER LAMB,<br><br>Defendants. | Civil Action No. A-00-CA-813 JN |

## PLAINTIFF ABDURRAHMAN'S SUPPLEMENTARY AUTHORITY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Naeem M. Abdurrahman, plaintiff, respectfully directs the attention of the court to *Branton v. The City of Dallas*, ___ F.3d ___ (5th Cir. No. 99-11206, decided November 9, 2001). The opinion was issued by the Fifth Circuit Court of Appeals on the day that plaintiff prepared his memorandum opposing the defendants' motion for summary judgment. A copy of the slip opinion, which is not yet available on Westlaw, is attached.

In pages 6 and 7 of the slip opinion, the court holds, citing authority applicable to the time this action arose, that a public employee's speech may relate to a public concern for purposes of First Amendment analysis if it does not involve solely personal matters and discusses the parameters of

the clearly established law applicable to a public employee's rights to free expression under the First Amendment.

At pages 10-13, the Fifth Circuit panel discusses generally the analysis of qualified immunity to claims under the First Amendment.

The parts of the opinion to which reference is made are material to the argument in plaintiff's memorandum opposing summary judgment, at pages 9-11.

By citing additional authority, plaintiff in no way intends to waive or diminish his opposition to the court's consideration of the qualified immunity defense in the motion for summary judgment, which is untimely in accordance with Local Rule CV-12.

Respectfully submitted,

David T. López
Attorney-in-Charge for Plaintiff
State Bar of Texas No. 12563000
3900 Montrose Boulevard
Houston, TX 77006-4959
Telephone: 713.523.3900
Telecopier: 713.523.3908
E-mail: dtlopez@lopezlawfirm.com

OF COUNSEL:

DAVID T. LOPEZ & ASSOC.

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing submission was served on this 13th day of November, 2001, on the attorney-in-charge for the respondent party or parties by placing it in the United States Mail, postage prepaid, addressed to the last known address of each as follows:

Linda A. Halpern, Esq.
Assistant Attorney General
General Litigation Division
Office of the Texas Attorney General
P. O. Box 12548
Austin, TX 78711-2548

David T. López

UNITED STATES COURT OF APPEALS

For the Fifth Circuit

No. 99-11206

DEBORAH A. BRANTON

Plaintiff - Appellant

v.

THE CITY OF DALLAS; BENNIE R. CLICK, Chief of Police Individually & in His Official Capacity

Defendants - Appellees

- - - - - - - - - - - - - - - - - - -

DEBORAH A. BRANTON

Plaintiff - Appellant

v.

THE CITY OF DALLAS

Defendant - Appellee

Appeal from the United States District Court

for the Northern District of Texas

November 9, 2001

Before POLITZ, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

```
An internal affairs investigative officer in the Dallas Police
Department filed this 42 U.S.C. § 1983 suit for employment
retaliation in violation of her First Amendment right to free speech.
The officer was downgraded in performance rating, removed from
investigative and supervisory duties, and effectively disqualified
for promotions and overtime pay because of her alleged improper ex
parte communication with a hearing officer, an assistant city
manager, in a police disciplinary case in which she served as
investigator. The internal affairs officer appealed from the district
court's grant of summary judgment in favor of the Chief of Police and
the Police Department. We conclude that the statements made by the
internal affairs officer addressed a matter of public concern; that
the statements are entitled to First Amendment protection; and that
the internal affairs officer's right to speak was clearly established
at the time the Chief acted. Whether the internal affairs officer was
subjected to adverse employment action because of the exercise and
content of her speech or because her speech was improperly made in
the form of an ex parte communication is a genuinely disputed issue
of material fact. We therefore reverse the summary judgment and
remand the case for further proceedings.
```

I. FACTUAL AND PROCEDURAL HISTORY In this case, before us for the second time, [1] Plaintiff, Deborah A. Branton, has been employed by the Dallas Police Department since 1977. She has been a sergeant in the Office of Professional Standards, Internal Affairs Division ("IAD"), since 1989. After nearly two decades, her departmental resume contained twenty-one commendations and no indication of any reprimands for misconduct. Prior to the events leading up to this action, her duties included the investigation of internal and external complaints filed against sworn and non-sworn employees of the Dallas Police Department, supervising detectives assigned to the IAD, and appearing at administrative appeal hearings. At such hearings it was her duty as an internal affairs investigator to present the findings of her investigation of the case, to turn over her investigative file to

the presiding officer, an assistant city manager, and to observe and ensure that no false or inaccurate information was offered.

In July 1995, Branton was assigned to investigate a complaint filed by Officer DeLois Thomas against Officers Thomas Popken and Billy Hattaway. In her complaint, Thomas alleged that Popken, an "International Instructor" in the use of police batons, had improperly accepted a fee of $125 from Hattaway for baton instructions and training, partially while on duty. Branton's investigation and report indicated that Popken admitted accepting a $125 check from Hattaway but claimed that he later tore it up; he said he only accepted the check so that he could honestly inform the international baton association that he had complied with what he thought was its rule when he certified that Hattaway had completed the course.

According to Branton's investigation, Thomas and Popken had apparently developed some animosity towards each other stemming from their common ambition to become certified as an International Instructor in police baton, of which there were only thirty-five in the world. Popken had been invited by Monadnock, the baton vendor who certified police officers according to their level of knowledge and proficiency in the use of the baton, to try out for certification. He applied to the city for funds to finance his travel to Colorado for that purpose. The officer in charge denied Popken's application, however, because Thomas had earlier been turned down for a similar request after she claimed she had been invited to apply for certification. The officer said that it would be unfair for the city to pay Popken's way after it refused to do so for Thomas. Popken called Monadnock and was told that Thomas had never been invited or told that she would be recommended for certification. Subsequently, Popken traveled to Colorado at his own expense and became certified as an International Instructor. Popken's new status authorized him to recertify Intermediate Instructors such as Hattaway and Thomas to give baton instructions to recruits or beginners.

Thomas's internal affairs complaint against Popken apparently arose out of their mutual animosity and her perception that Popken had unduly delayed her recertification. When Thomas told Branton that she had been invited by Lieutenant Art Sapp to become an International Instructor, Branton called Sapp to confirm this story. Sapp, however, denied "inviting" Thomas to become an International Instructor, but said he had only responded to her inquiry expressing interest in becoming one and replied that she would first have to complete additional training before he would consider nominating her.

Based on Branton's investigation and report, Chief Click suspended Popken for one day. Popken appealed the discipline imposed. On November 26, 1996, a hearing on the appeal was held before an Assistant City Manager, Levi Davis, the ultimate decision-maker in the matter; his decision was final and unappealable.

At the hearing, Thomas testified (not under oath) that Sapp had invited her to become an International Instructor. Branton, who attended the hearing as the investigating IAD officer, considered the testimony of Thomas to be false and in contravention of Chief Click's departmental ethical policy statement regarding truthfulness. Although Branton had, in accordance with her responsibilities, submitted her investigative report to Davis, Branton had personal knowledge that Davis did not read reports prior to hearings and, therefore, would be unaware that Thomas had testified falsely. Because one of her duties as an IAD investigator was to ensure that the testimony given at an official hearing was truthful, Branton said she felt obliged to protect the integrity of the investigative process and to report her concern about Thomas's testimony.

Branton testified that it was her intent to tell Davis about her concerns with Thomas's testimony during the hearing, but she was reluctant to create a confrontation with Thomas. Branton had already corrected Thomas's testimony on a different point during the hearing after Thomas created the impression that

some sort of collusion was involved in the investigation of Popken's misconduct. Thomas testified that Executive Assistant Chief Manuel Vasquez had reduced one of the allegations of misconduct against Popken. Branton corrected this impression, stating that Chief Click had instructed her to change the allegation. Branton testified that when she brought this matter to Davis's attention during the hearing, the City Attorney appeared to be disturbed and upset. Therefore, she intended to raise her other concerns about Thomas's testimony after Thomas left the stand and asked the City Attorney when Thomas would be excused from the stand. The City Attorney, apparently still "irritated" that Branton had once before corrected Thomas's testimony, dismissively informed Branton that such a concern was "not [her] problem" but the problem of Popken's attorney.

Immediately after Thomas was excused, Davis closed the hearing. As those in attendance began to leave, Branton, in the presence of the City Attorney, requested the opportunity to speak with Davis. Davis excused the City Attorney, and Branton informed him of the inconsistency between Thomas's statement and Lieutenant Sapp's disclosures and her belief that Thomas's testimony on that matter had been false. Branton made no attempt to influence the outcome of the hearing or to persuade Davis as to the appropriateness of Popken's punishment. Davis made no indication that their conversation was inappropriate.

On December 3, 1996, Mr. Davis issued his decision reducing Popken's one-day suspension to a "letter of counseling." In addition, Davis ordered that Popken be reimbursed for his out-of-pocket expenses related to his International Instructor training, if the Department continued to request that he certify Intermediate baton instructors. Shortly after he received the decision, Chief Click informed Branton that she was being transferred out of IAD because of the post-hearing statement she had made to Davis. Although the Chief rescinded the transfer after conferring with the City Attorney, he stripped Branton of her duties and responsibilities as an investigator and supervisor, rescinded her authority to supervise detectives and other personnel, and assigned her to handle the "walk-in" complaints, a job viewed by IAD investigators as highly undesirable. More importantly, perhaps, the Chief placed an administrative disciplinary report in her file which is open to the public, jeopardizes her ability to receive a promotion or recover investigator status for at least three years, and prevents her from earning overtime pay.

Branton claimed she had never been advised of a policy against reporting a witness's misconduct to an assistant city manager, and she produced deposition testimony from Senior Corporal Nancy Wallace and IAD Investigator Crista Walker that they too had no knowledge and were given no training on such a policy. In fact, both Chief Click and Assistant City Manager Davis testified that there was no rule, regulation, or policy of the Dallas Police Department that prohibited Branton's post-hearing communication. Moreover, post-hearing communication between IAD investigators and assistant city managers does not appear to have been an unknown practice in Dallas. Both Senior Corporal Wallace and IAD Investigator Walker, in addition to Sergeant Margie Cunningham of the IAD, testified that they too had had communications and conversations with assistant city managers after the conclusion of a hearing and outside the presence of the appellant and his attorney. Sergeant Cunningham and Senior Corporal Wallace testified that after an appeal hearing before Davis, he invited them and a city attorney to his office for further questioning. Crista Walker testified that Assistant City Manager Mary Suhm had initiated such a post-hearing conversation with her.[2]

Branton also contends that she thought it was her duty as the IAD officer on the case to inform the Assistant City Manager of any discrepancies in witnesses' testimony and that it was her duty to the City, the Department, and the public to do so. Again, the testimony of other IAD investigators supports Branton's claim. IAD Investigator Walker testified that it was "part of [her] responsibility" to bring false testimony to light; Senior Corporal Wallace testified similarly.

Branton testified that she, at all times, believed she was carrying out the goals and policies of Chief Click, as outlined by the Chief in his honesty and truthfulness policy statement on January 11, 1995, long before this case arose. Chief Click's memorandum on the subject of "Ethical Standards of Conduct" was sent to all personnel and was clear and unequivocal.[3] After citing the pertinent sections of the Dallas Police Department Code of Conduct regarding honesty and truthfulness, the Chief informed all personnel that the mission statement of the Department being prepared would state that employees will: "Be examples of honesty and integrity in their professional and personal lives, thereby earning public trust." To this the Chief added statements of his own stressing complete honesty by police officers as a means of earning public confidence and trust:

(1) "The ethical standards of truthfulness and honesty form the basis of public confidence."

(2) "This standard for truthfulness [set forth in each officer's oath of office and court testimony] applies to all aspects of our duties, not only courtroom testimony, but in the preparation of offense and arrest reports, administrative internal statements, and in everything we say and write while performing our duties." (emphasis added).

(3) "This standard will be adhered to by all members of the Department, both sworn and non-sworn employees."

(4) "We must all take responsibility for protecting this standard of professional conduct. Untruthfulness or dishonesty cannot and will not be tolerated. Therefore, any employee found to be untruthful or dishonest will, in most cases, be terminated."

A printed motto appeared at the bottom: "The Only Reason You And I Are Here Is To Serve The Citizens of Dallas."

Chief Click described in his deposition what had caused him to issue the Ethical Standards Conduct policy statement to all of his personnel: "[After I became chief of police,] I was concerned that I saw . . . too frequently what I felt were officers that, particularly during internal investigations, were less than truthful, either evasive, don't know, don't remember, wasn't there or in some cases just out and out lying about what happened."

On February 6, 1997, Branton filed suit under 42 U.S.C. § 1983 against the City of Dallas and Chief Click, alleging that Chief Click had violated her First Amendment rights by punishing her for the exercise and content of her free speech concerning the false testimony by a police officer. The district court granted Chief Click's partial motion to dismiss under Rule 12(b)(6) on qualified immunity grounds. A panel of this court reversed and remanded. After discovery, the district court issued summary judgment in favor of the defendants, holding that Branton's speech was not protected by the First Amendment. Branton's present appeal followed.

II. STANDARD OF REVIEW We review de novo the district court's conclusion that summary judgment was proper. Victor v. McElveen, 150 F.3d 487, 453-54 (5th Cir. 1998). In reviewing the district court's grant of summary judgment, we must view all the disputed facts and reasonable inferences in a light most favorable to the non-movant, Branton, and determine whether she has set forth sufficient evidence to demonstrate that her speech concerned a matter of public import and, if so, whether Branton's interest in speaking outweighed the city's interest in efficiency. Id. Summary judgment is appropriate if the movant shows that there is no genuine issue of material fact for trial. Fed.

R. Civ. P. 56(c). To withstand summary judgment, Branton must show, by affidavits, depositions, answers to interrogatories, and admissions on file, that there are specific facts that create a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

### III. FIRST AMENDMENT CLAIM

It is well established that a governmental employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983). We review the plaintiff's First Amendment retaliation claim under the four-step test derived from Connick and Pickering v. Board of Education, 391 U.S. 563 (1968). Teague v. City of Flower Mound, 179 F.3d 377, 380 (5th Cir. 1999)(quoting Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999)).

The first two questions are legal in nature and are for the court to resolve. See Connick, 461 U.S. at 147-48, n.7; Teague, 179 F.3d at 380; Coughlin v. Lee, 946 F.2d 1152, 1156 (5th Cir. 1991). Initially, we must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146. If it can, we must then balance the employee's interest, as a citizen, in commenting upon matters of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public service[s] it performs through its employees." Rankin, 483 U.S. at 388 (citing Pickering, 391 U.S. at 568).

It is for a jury to resolve any remaining factual disputes as to whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision, or whether the employer would have made the same employment decision in the absence of the protected speech. Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996).

#### A. Public Concern

Matters of public concern are those which can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, id. at 148, speech "complain[ing] of misconduct within the police department . . . [is] speech addressing a matter of public concern." Thompson v. City of Starkville, Mississippi, 901 F.2d 456, 463 (5th Cir. 1990); Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1051 (5th Cir. 1992). "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . concerns matter of public import." Thompson, 901 F.2d at 463 (quoting Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1998) (per curiam)). In making this determination, we consider the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

The content of a public employee's speech may relate to a public concern for purposes of First Amendment analysis if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of a manager's status as an arm of government. Connick, 461 U.S. at 147; Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 372 (5th Cir. 2000)(citing Wilson v. UT Health Ctr., 973 F.2d 1263, 1269 (5th Cir. 1992); Terrell v. Univ. of Texas Sys. Police, 792 F.2d 1360, 1365 n.5 (5th Cir. 1986)). "If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." Kennedy, 224 F.3d at 372 (citing Thompson, 901 F.2d at 463 n.5). "Public employees by virtue of their public employment, may make valuable contributions to

public debate." Gonzales v. Benavides, 774 F.2d 1295, 1299 (5th Cir. 1985). The nature of their employment does not exclude the possibility that an issue of private concern to the employee may also be an issue of concern to the public. Id. at 1305. "Neither the [First] Amendment itself nor our decisions indicate that . . . freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." Givhan v. Western Line Consolid. Sch. Dist., 439 U.S. 410, 415-16 (1979); see also Kennedy, 224 F.3d at 374; Thompson, 901 F.2d at 467; Wilson, 973 F.2d at 1265; Benningfield v. City of Houston, 157 F.3d 369, 373-74 (5th Cir. 1998); Brown v. Texas A & M Univ., 804 F.2d 327, 337 (5th Cir. 1986).

It is undisputed that, at the time the adverse employment action was taken, speech related to improper acts by public officers qualified as a matter of public concern. Schultea v. Wood, 27 F.3d 1112, 1120 (5th Cir. 1994) ("No reasonable public official in 1992 could have assumed that he could retaliate against an employee because of the employee's disclosure of instances of misconduct by a public official."), superseded on other grounds, 47 F.3d 1427 (1995)(en banc); see also Benningfield, 157 F.3d at 375-77; Wilson, 973 F.2d at 1270; Thompson, 901 F.2d at 463. Exposure of official misconduct, especially within the police department, is generally of great consequence to the public. Brawner v. City of Richardson, 855 F.2d 187, 191-92 (5th Cir. 1988). "There is perhaps no subset of 'matters of public concern' more important, [for purposes of First Amendment protection of speech of public employees,] than bringing official misconduct to light." Davis v. Ector County, 40 F.3d 777, 782 (5th Cir. 1995); see also Denton v. Morgan, 136 F.3d 1038, 1043 (5th Cir. 1998); Thompson, 901 F.2d at 463.

Applying the relevant principles of law to the evidence with reasonable constructions and inferences drawn in favor of the non-mover, Branton, we conclude that the content, form, and context of her statements to the Assistant City Manager, reporting what she perceived to be dishonest testimony of another police officer at a disciplinary hearing, was a matter of public concern. Although Branton's speech occurred at work, because her job required her to report false testimony at official hearings, Branton had not only an invitation but a duty to speak. Thus, "the context factor weighs in h[er] favor." Victor v. McElveen, 150 F.3d 451, 458 (5th Cir. 1998)(citing Bickel v. Burkhart, 632 F.2d 1251, 1252 (5th Cir. 1980)). According to Chief Click's own written statement of Police Department policy it is extremely important to the public that police officers be truthful in all aspects of their duties, not only in the courtroom, but in "everything [they] say," including "administrative internal statements." In the words of Chief Click, "[T]ruthfulness and honesty form the basis of public confidence." The Chief's policy is admirable and important itself, because police officers who are constantly trained and reminded to be truthful in "everything [they] say" will be less likely to give false evidence in court or fabricate statements that might endanger the liberty of innocent citizens.

B. Pickering Balancing Test

Because Branton's statement addressed a matter of public concern, Pickering next requires that we balance Branton's interest in making her statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. The employee's statement is not considered in a vacuum, however. Rankin, 483 U.S. at 388. "In performing the balancing, ... the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Id. (citing Connick, 461 U.S. at 152-53; Givhan, 439 U.S. at 415 n.4). "The Supreme Court has recognized as pertinent considerations 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Victor, 150 F.3d at 457 (quoting Pickering, 391 U.S. at 570-73).

The state interest considerations focus on the "effective functioning of the public employer's enterprise." Rankin, 483 U.S. at 388. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Id. "[R]eal, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech. . . ." McKinley v. City of Eloy, 705 F.2d 1110, 1115 (5th Cir. 1983). In this respect, the defendants fail to demonstrate, without dispute as to material facts, a state interest that outweighs Branton's First Amendment rights. Although Branton's statement was made at the workplace, there is a genuine dispute as to whether it interfered with the efficient functioning of the police department.

Viewed in the light most favorable to Branton, the evidence of record shows that Branton's statement caused no unanticipated delays or disruption or interference with the disciplinary proceedings or the functioning of the police department. Chief Click admitted in his deposition that he had no evidence and could cite no facts which showed that Branton's statement adversely affected the efficiency or morale of the police department. Chief Click and Assistant City Manager Davis testified that there were no rules, regulations, or standard operating procedures that prohibited IAD investigating officers from reporting misconduct or false testimony to an Assistant City Manager as Branton had done. Moreover, they testified that there had been no effort to train or instruct the IAD officers on what was expected of them in connection with disciplinary hearings. Although Chief Click said he had not been aware of other such communications between IAD officers and assistant city managers, there was evidence that the assistant city managers and city attorneys had allowed such communications to occur. Consequently, a reasonable trier of the facts could find or infer that, despite the Chief's claim of lack of knowledge, the actual custom and practice of the department permitted post-hearing conferences between IAD officers and the assistant city managers. There was no evidence that the efficiency or morale of the department or its officers had been adversely affected by that custom or practice.

Further, Davis testified that, in addition to being the hearing officer in Officer Popken's case, he was primarily responsible for administering the day-to-day operations of the police and fire departments; that in effect he had been delegated executive authority over the police department and its chief by the city manager. Thus, the record does not establish that the chief of police had exclusive or autonomous authority to discipline officers for their conduct while acting as witnesses or investigators assisting the assistant city managers in disciplinary appeals, especially if the officers were innocently acting in accord with procedures established by the assistant city managers.

Although Chief Click professed to have no knowledge of previous post-hearing communications between IAD investigators and assistant city

managers at disciplinary appeals, he did not inquire into the practices or procedures established by the assistant city managers or ascertain whether he had the authority to modify their procedures unilaterally.[4] The record reflects that he consulted the city attorney only <u>after</u> he had ordered Branton transferred out of the IAD; a sanction he modified after receiving legal advice. Assuming the Chief had been allocated the authority to regulate the conduct of IAD officers during disciplinary appeals or related conferences, he offered no evidence or explanation as to why he could not have remedied the perceived institutional shortcoming by providing the IAD officers with training, instructions, or regulations on the subject. There was no evidence that the IAD officers knew or should have known that the practice was contrary to police department rules, regulations, or policy. There was no evidence that Branton knowingly acted improperly or in bad faith. Consequently, a reasonable trier of fact could find that the Chief's imposition of severe punishment on Branton individually, instead of adopting or recommending a new rule, regulation, instruction, or operating procedure governing investigator-city manager communications in disciplinary cases, was in fact retaliation against Branton for the exercise and content of her speech that may have contributed to the reduction of the Chief's suspension of Popken, rather than discipline for the time and manner of her post-hearing statements to the assistant city manager.

Although Branton did not violate any known police department rule, regulation, or policy, Chief Click testified that the action taken against her was warranted because she should have known through her common sense and her experience that ex parte IAD officer/assistant city manager communications would lead to unfair hearings and loss of confidence and morale among police officers. In addition to all of the other factors recited above that tend to undermine this argument, the assumption upon which it is based, i.e., that the police department's internal disciplinary appeal closely replicates a trial or an appeal in a court of law, is not borne out by the record. Testimony at the disciplinary hearings is not taken under oath. The IAD investigating officer presents to the assistant city manager her total investigative file in support of the disciplinary charges against the appellant. The IAD officer's investigative file consists of summaries of her interviews with various persons having knowledge relevant to the case. The appellant, with or without the assistance of counsel, is offered an opportunity to respond. At the end of the hearing, the assistant city manager takes the case under advisement, considers the investigative file and the testimony heard, and in due course renders decision, which is not further appealable. The police department's disciplinary appeal resembles a less than formal administrative hearing more than a fully adversarial formal court proceeding.

Moreover, concerns about maintaining harmony and eliminating disruption cannot be the sole measure of government interest when the employee's speech furthers other important state interests. For example, in Wilson v. UT Health Center, 973 F.2d 1263, 1270 (5th Cir. 1992), the defendant argued that a police officer's interest in reporting sexual harassment within the department was outweighed by the police force's interest in eliminating dissension and providing efficient police protection. This court concluded, however, that if a jury determines that the police officer "reported sexual harassment in good faith," then the state's "interest in maintaining a police force that is free of sexual intimidation, which [her] good faith reports would serve, outweighs any interest in departmental efficiency and harmony." <u>Id.</u>

Similarly, Branton's good faith comments serve a very important state interest--the prevention or elimination of perjury, other false testimony, and corruption within municipal law enforcement departments. In fact, Chief Click agrees that it would be entirely proper and salutary for an IAD officer to present such information to the Assistant City Manager during the disciplinary hearing. The Chief and the city attempt to justify the severe adverse actions taken against Branton by arguing that ex parte communications from the IAD investigators to the assistant city managers may affect the integrity of the disciplinary hearings and the morale of the police force. We agree that their goals are laudatory, but

these objectives doubtlessly could be achieved more constructively and effectively by adopting rules and regulations, or by providing the IAD officers with instructions and training, instead of imposing harsh employment sanctions that violate the First Amendment rights of an innocent, well-intentioned individual government employee.

Construed in the light most favorable to Branton, the record contains no evidence that Branton made statements in bad faith or with an intent to disrupt the hearing or the department's operations for an improper reason. Branton's remarks were made in response to what she considered her duty as a police officer, pursuant to the Chief's memo urging individual responsibility for honest law enforcement and in her special capacity as the IAD investigating officer assigned to the case to assist in seeking the truth.

Viewing the facts from the summary judgment record and inferences therefrom in a light most favorable to Branton, we conclude not only that Branton's speech addressed a matter of public concern but also that under the Pickering balancing test, Branton's interest in speaking outweighs the defendants' interest in efficiency. Consequently, her conduct falls under the protective aegis of the First Amendment. Accordingly, the district court erred in granting summary judgment to the City and Chief Click on these grounds.

## IV. QUALIFIED IMMUNITY

Because Branton has established for purposes of summary judgment practice that Chief Click violated her First Amendment right to free speech under current law, we next turn to Click's argument that he is entitled to qualified immunity because the law governing his conduct was not clearly established when the conduct occurred; and, alternatively, if it was, that a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful.

A court required to rule upon the qualified immunity issue must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." Saucier v. Katz, 533 U.S. 991,___, 121 S.Ct. 2151, 2156 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)); see also Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 531 U.S. at ___, 121 S.Ct. at 2156. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.; see also Price, 256 F.3d at 369. The Supreme Court has emphasized "'that the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Saucier, 531 U.S. at ___, 121 S.Ct. at 2156 (quoting

Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

This does not require that the courts must have agreed upon the precise formulation of the standard. Id. "Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard." Id. at ___, 121 S.Ct. at 2157.

Although we have just determined above that under present law Chief Click's punitive employment action against Branton because of her speech pointing out dishonest conduct by another officer violated the First Amendment, the question remains whether this was clearly established in January of 1997, when Click decided to strip her of all internal affairs investigative duties and to relegate her to taking down walk-in complaints. We conclude that, at that time, Branton's right had been defined at the appropriate level of specificity so that a court could determine that it was clearly established and that its contours had become sufficiently clear so that a reasonable official, identically situated, would understand that what he was doing violated that right.

For at least thirty-four years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. See Keyishian v. Bd. of Regents, 385 U.S. 589 (1967). In Pickering, 391 U.S. at 573-75, the Supreme Court held that the public interest in having free debate on matters of public concern--the core value of the Free Speech Clause of the First Amendment--is so great that a public school teacher's right to speak on matters of public importance may not furnish the basis for his dismissal from public employment. The Court's cases following Pickering also involved protecting speech of government employees on matters of public concern. Perry v. Sindermann, 408 U.S. 593 (1972) (state college teacher's right to testify before legislative committees in public debate regarding whether college should be elevated to four-year status); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) (public school teacher's right to leak administration's bond issue related dress code for teachers to radio station); Givhan, 439 U.S. 410 (1979) (public employee's right to private expression to employer of views on school district's racial policies). In Connick, 461 U.S. at 147, the Court found that improper pressure on assistant district attorneys to work in political campaigns is a matter of public concern but concluded that when a public employee speaks on

matters only of personal interest, such as an employee's grievance on a job transfer and not on a matter of public concern, that speech is unprotected, absent the most unusual circumstances.

This Court of Appeals has further clarified the contours of public employees' First Amendment free speech rights to report misconduct by fellow employees and officers. We have held that public employees' speech reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern. Wilson, 973 F.2d at 1269 (reporting sexual harassment by superiors); Schultea, 27 F.3d at 1119-20 (reporting suspected criminal activity of city council member), superseded on other grounds, 47 F.3d 1427 (1995)(en banc). In Brawner, 855 F.2d at 191, we held that a police officer's communication in his attorney's letter accusing the police department of non-criminal investigations of journalists, citizens, and candidates for city council addressed matters of public concern. "The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." Id. at 191-92 (citing Gonzalez v. Benavides, 712 F.2d 142 (5th Cir. 1983); Solomon v. Royal Oak Township, 842 F.2d 862, 865 (6th Cir. 1988); O'Brien v. Town of Caledonia, 748 F.2d 403, 407 (7th Cir. 1984); Brockell v. Norton, 732 F.2d 664, 668 (8th Cir. 1984)) (footnotes omitted).

In Denton, 136 F.3d at 1038, we held that in September of 1991 and January of 1992, when juvenile probation officers were fired by a school district for going over its heads to report perceived wrongdoing by the district to the state education agency, they had a constitutional right to address that matter of public concern. "[S]peech reporting official misconduct, wrongdoing, or malfeasance on the part of public officials involves matters of public concern." Id. at 1043 (citing Wilson, 973 F.2d at 1269; Schultea, 27 F.3d at 1120; Brawner, 855 F.2d at 192).

In Warnock v. Pecos County, Texas, 116 F.3d 776, 781-82 (5th Cir. 1997), we held that state judges' decision not to reappoint the county auditor violated the First Amendment, that the relevant First Amendment law was clearly established when the judges made their decision in 1993, and that firing a county auditor for reporting violations of the law is objectively unreasonable. And, in Frazier v. King, 873 F.2d 820, 827 (5th Cir. 1989), we denied qualified immunity to the warden of a state correctional center who fired a registered nurse in violation of her clearly established right to report violations of nursing practices in the infirmary. See also Thompson, 901 F.2d at 468-70 (denying qualified immunity to police officials who terminated a police officer for filing written grievances related to the department's promotion policy and for making oral complaints about police misbehavior); Harris, 168 F.3d at 223-24 (denying qualified immunity to school superintendent for reprimanding two

teachers who made critical remarks in 1995 about the school's principal and stating that "[t]he Defendants are not insulated from their unconstitutional conduct merely because a balancing test is involved in our [First Amendment] analysis"); 2 Ivan E. Bodensteiner & Rosalie Berger Levinson, State & Local Government Civil Rights Liability § 1A:05 n.88 (2000) (citing cases from all circuits).

After reviewing the foregoing cases, we conclude that, at the time Branton spoke out, it was clearly established under facts "not distinguishable in a fair way from the facts in the case at hand," that Branton's speech revealing false testimony by a fellow police officer was protected and that "the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard." Saucier, 531 U.S. at ___, 121 S.Ct. at 2157. Consequently, a reasonably objective public official, identically situated in Chief Click's position, would have known that adverse employment action against an employee for her speech concerning false testimony by a fellow officer would violate a clearly established constitutional right. Therefore, the defendants here are not entitled to summary judgment on their claim of qualified immunity.

While Branton must ultimately prove that the exercise and content of her speech, rather than its time and manner, was the motivating factor in the adverse employment action she suffered, the determination of that issue turns on a genuine dispute of material fact, and is a proper issue for trial, not for resolution by summary judgment. We intimate no opinion on the ultimate merits of the litigation. We simply hold that the district court incorrectly granted summary judgment at this time on the record before us.

For these reasons, the summary judgment is REVERSED and the case is REMANDED for further proceedings.


JERRY E. SMITH, Circuit Judge, dissenting:



Defendants argue, and the district court found, that Branton's report to Davis was of no concern to the public. Agreeing with that assessment, I respectfully dissent and would affirm.

Branton merely communicated her opinion that Thomas had lied regarding an invitation to become an International Instructor. As an independent matter, that content is obviously of no public import, for the public is not concerned with Thomas's ambitions regarding baton instruction. If the communication involved serious police

misconduct or corruption, however, it would be of public concern. Thus, in *Brawner v. City of Richardson*, 855 F.2d 187, 191-92 (5th Cir. 1988), this court stated that "[t]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department."

Defendants correctly urge that an alleged lie during testimony at an administrative hearing concerning a purely internal police matter (i.e., a matter that did not concern the public safety mission of the police department) is not of public concern. Defendants point out that even if a lie at such a hearing potentially could be of public concern, it is of no such concern when it is completely tangential and irrelevant to the purpose of the hearing. For example, if an officer lied about his age, the fact that it occurred at a police administrative hearing would not elevate that content to a matter of public concern. Here, whether Thomas was requested to become an International Instructor is irrelevant to Popken's wrongdoing.

Branton, citing language of this court, counters that any falsehood during testimony at a police administrative hearing, regardless of relevance, is police misconduct and therefore is of public concern. The majority apparently agrees, emphasizing that "because police officers who are constantly trained and reminded to be truthful in 'everything [they] say' will be less likely to give false evidence in court or fabricate statements that might endanger the liberty of innocent citizens."

In *Brawner*, this court held that speech regarding illegal police investigations of citizens and politicians was of public concern. *See Brawner*, 855 F.2d at 189-90. "Because the speech at issue complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern." *Id.* at 192.

In *Thompson v. City of Starkville*, 901 F.2d 456, 463, 466 (5th Cir. 1990), we held that there was a fact issue whether speech alleging theft of confiscated property and racial discrimination in a police department constituted a matter of public concern:

This court has held, albeit under different facts, that where speech 'complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern' [citing *Brawner*]. If released to the public, Thompson's affidavit would expose possible corruption in the police force of the City.

The *Thompson* court went on to note that the case involved allegations of widespread misbehavior within the police force "which could potentially affect public safety," such as the allegation that certain officers might not respond to a request for backup of a black officer. *Id.* at 466. *Thompson's* recognition that the facts of *Brawner*

were different, and its discussion of the potential public interest in the specific speech under consideration, demonstrate that Branton's broad reading of *Brawner* is not the law of this circuit.

Branton's contention that every breach of internal employee rules is of public concern merely because it takes place within a police department is supported neither by our precedent nor by logic. Even accepting all of Branton's factual assertions--namely, that she truly thought Thomas had lied, that she breached no specific department guidelines by speaking when she did, and that she acted in good faith and out of no ill motive--the content of her speech was not of public concern, and therefore her First Amendment claim fails, without the need to address the issue of the interests of the employer or of qualified immunity.

This court should not sit in judgment of personnel actions that do not violate the Constitution. I respectfully dissent.

1. See Branton v. City of Dallas, No. 97-11352 (5th Cir. Dec. 10, 1998).

2. Walker, however, testified that the extent of the conversation was one question by Suhm as to how long an officer had been in the department. Further discussion was interrupted by Assistant City Attorney Prema Velu.

3. Chief Click's memorandum on the ethical standards of conduct states as follows:

The Dallas Police Department Code of Conduct, Chapter VIII, Section 8.3, 8.4, and 8.5 specifically address standards of employees' behavior and ethical conduct in regards to honesty and truthfulness. The mission statement of the Dallas Police Department which is being prepared for distribution and display specifically states that employees will:

Be examples of honesty and integrity in their professional and personal lives, thereby earning public trust.

The ethical standards of truthfulness and honesty form the basis of public confidence. Every sworn officer not only takes an oath of office to "faithfully" execute the duties of the office of Police Officer for the City of Dallas, but this oath is reaffirmed when we, as police officers, are called to testify in any case and we swear to tell the whole truth and nothing but the truth. This standard for truthfulness applies to all aspects of our duties, not only courtroom testimony, but in the preparation of offense and arrest reports, administrative internal statements, and in everything we say and write while performing our duties. This standard will be adhered to by all members of the Department, both sworn and non-sworn employees.

I recognize that an overwhelming majority of the members of this Department are honest and hardworking. As a result of this, each member should take pride in the Department's outstanding reputation for integrity and honesty, both internally and throughout the community.

We must all take responsibility for protecting this standard of professional conduct. Untruthfulness or dishonesty cannot and will not be tolerated. Therefore, any employee found to be untruthful or dishonest will, in most cases, be terminated.

The Dallas Police Department will remain committed to providing the finest in police service.

/s/ Bennie R. Click

Bennie R. Click

Chief of Police

4. The Dallas City Charter provides that the chief of police's "control of the police department, [is] subject to the supervision of the city manager and also [is] subject to the rules, regulations, and orders as the city manager may prescribe. . . ." Dallas City Charter, Ch. XII, § 2 (emphasis added).