RECE[...]

NOV 2 6 2001

CLERK, U.S. [...]
WESTERN DISTRICT OF [...]
BY _____ _DR_
DEPUTY [...]

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



FILED

NOV 2 6 2001

BY [...] DISTRICT COURT
_My C_ Deputy

| | | |
|---|---|---|
| NAEEM M. ABDURRAHMAN, | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | |
| THE UNIVERSITY OF TEXAS, | § | CIVIL ACTION NO. A 00 CA 813 JN |
| DALE E. KLEIN, | § | |
| LARRY R. FAULKNER, | § | |
| SHELDON EKLAND-OLSON, | § | |
| BEN G. STREETMAN, | § | |
| NEAL E. ARMSTRONG, | § | |
| SHELDON LANDSBERGER and | § | |
| J. PARKER LAMB, | § | |
| *Defendants.* | § | |

## **DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

4/3

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  Defendants' Qualified Immunity Argument is Timely . . . . . . . . . . . . . . . . . . . . . . 2

II. Defendants Are Entitled To Summary Judgment As A Matter of Law
    On Plaintiff's First Amendment Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Plaintiff Never Spoke Out About The Issue Of Routing Funds Through
        The ANRC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  There Is No Evidence Tat Plaintiff's Speech Was A
        Motivating Factor In The Denial Of Tenure . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  All Of The Individual Defendants Are Entitled to Qualified Immunity
        With Respect To Plaintiff's First Amendment Claim . . . . . . . . . . . . . . . . . . 14

III. There Are No Material Facts In Dispute With Respect To Plaintiff's
     Discrimination Claim And Defendants Are Entitled To Summary Judgment . . . . . . . . 17

    A.  There Is No Evidence Of Racial Discrimination . . . . . . . . . . . . . . . . . . . . . . 17

    B.  Defendants Are Entitled To Qualified Immunity As To
        Plaintiff's Discrimination Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV. There Is No Evidence To Support Plaintiff's Newly Minted Title VI Claim . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

# TABLE OF AUTHORITIES

## CASES

*Allen v. Rector,* No. CIVASA-98-CA-0193NSN, 2000 WL 33351829
(W.D.Tex. Sept. 28, 2000 ................................................................................... 2

*Apostol v. Gallion,* 870 F.2d 1335 (7th Cir. 1989) ....................................................... 3

*Branton v. City of Dallas,* 2001 WL 1398532 (5th Cir. November 9, 2001) ............................. 8

*Chacon v. Housing Authority of City of El Paso,* No. EP-99-CA-410-DB,
2000 WL 33348200 (W.D.Tex. Oct. 31, 2000) ............................................. 2

*Crawford-El v. Britton,* 523 U.S. 574 (1998) ............................................................. 14

*Dollis v. Rubin,* 77 F.3d 777 (5th Cir. 1995) ............................................................. 13

*Guzman-Rivera v. Rivera-Cruz,* 98 F.3d 664 (1st Cir. 1996) ............................................. 3

*Jones v. Wells,* 989 F.2d 493 (4th Cir. 1993) ............................................................. 3

*Mato v. Baldauf,* 267 F.3d 444 (5th Cir. 2001) ....................................................... 11, 12

*McElroy v. City of Macon,* 68 F.3d 437 (11th Cir. 1995) ................................................. 3

*Neinast v. Texas,* 217 F.3d 275 (5th Cir. 2000) ........................................................... 2

*Rosario-Diaz v. Gonzalez,* 140 F.3d 312 (1st Cir. 1998) ................................................. 3

*Skrtich v. Thornton,* 267 F.3d 1251 (11th Cir. 2001) ..................................................... 3

*Thompson v. Upshur County, TX,* 245 F.3d 447 (5th Cir. 2001) ......................................... 19

## STATUTES

42 U.S.C. § 1981 ............................................................................................. 6

42 U.S.C. § 1983 ............................................................................................. 13

| | | |
|---|---|---|
| NAEEM M. ABDURRAHMAN, | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | |
| THE UNIVERSITY OF TEXAS, | § | CIVIL ACTION NO. A 00 CA 813 JN |
| DALE E. KLEIN, | § | |
| LARRY R. FAULKNER, | § | |
| SHELDON EKLAND-OLSON, | § | |
| BEN G. STREETMAN, | § | |
| NEAL E. ARMSTRONG, | § | |
| SHELDON LANDSBERGER and | § | |
| J. PARKER LAMB, | § | |
| *Defendants.* | § | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In his desperation to bring this legally flawed case before a jury, plaintiff has pulled out all of the stops. He asks the Court to refuse to consider the individual defendants' qualified immunity defense prior to trial even though he has been on notice since the day their answer was filed that qualified immunity would be an issue in this case and has known since the scheduling order was filed that defendants would likely file a motion for summary judgment raising qualified immunity. Similarly, he seeks to avoid the significant problems associated with trying to jam his solitary e-mail within a First Amendment protected speech rubric by now trying to litigate the merits of speech made, not by plaintiff, but by two faculty members at another university. He has offered no evidence that his tenure denial was motivated either by his speech or his race. He has failed to establish even a prima facie case that he was qualified for tenure. The seven individual

-1-

defendants are therefore entitled to summary judgment, both on the merits and because they are entitled to qualified immunity. Finally, his Title VI claim appears to have "morphed" yet again, but remains unsupported by either his testimony or other record evidence. Defendant UT is thus entitled to summary judgment as well.

## I.    Defendants' Qualified Immunity Argument is Timely

A waiver of immunity must be unequivocal. *Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000), *cert. denied*, _U.S._, 121 S.Ct. 1188 (2001). Here, however, there has been no such waiver. On the contrary, the individual defendants raised qualified immunity as an affirmative defense in their answer, asserted it again in their motion for a Rule 7 Reply, used it as a basis for moving to stay discovery, and filed a motion for summary judgment on that issue on the only due date set for the filing of dispositive motions in this case. Plaintiff's collateral attack upon defendants' qualified immunity claims is, thus, inappropriate.

There is a paucity of cases interpreting local rule CV-12.[1] Lacking any real authority, plaintiff relies instead for his collateral attack upon inapposite caselaw. In the process, he utterly ignores his role in the drafting of joint statements setting deadlines for "dispositive motions." Defendants' conduct in this litigation, however, bears no resemblance whatsoever to the conduct

---

[1] Indeed, the only cases defendants have been able to locate which mention the rule are *Neinast v. Texas*, *supra*, which does not interpret it, and two unreported decisions, *Chacon v. Housing Authority of City of El Paso*, No. EP-99-CA-410-DB, 2000 WL 33348200 (W.D.Tex. Oct. 31, 2000); *Allen v. Rector*, No. CIVASA-98-CA-0193NSN, 2000 WL 33351829 (W.D.Tex. Sept. 28, 2000). In both of the unreported decisions, the court declined to apply local rule CV-12 to block defendant(s) qualified immunity motions and noted in each instance that, as here, defendants had placed the plaintiff on notice in their answers that they would be raising the defense.

of the parties in the cases plaintiff cites.[2] On the contrary, as the procedural history of this case makes clear, far from waiting until the last minute to "sandbag" plaintiff, it has, from the outset, always been defendants' clearly expressed intention to file a motion for summary judgment on the issue of qualified immunity.

Plaintiff's Original Complaint was filed on December 19, 2000. On March 12, 2001, the same date that defendants filed their answer raising qualified immunity as an affirmative defense, they also filed a motion for a Rule 7 Reply on the qualified immunity issue <u>and</u> a motion to stay discovery except on the limited issue of whether the defense of qualified immunity was available to defendants. On March 22, 2001, the Court simultaneously denied defendants' motion for a Rule 7 reply and issued an order staying discovery "except on the limited issue of whether the defense of qualified immunity is available to Defendants ...*until the Court rules on said issue of qualified immunity*"(emphasis added). No deadline was set for the filing of a separate motion regarding qualified immunity, either by the Court or by the parties. Indeed, on April 26, 2001, the

---

[2] The cases plaintiff cites in his opposition at 7-8 for the proposition that an untimely motion may be denied are all distinguishable. For example, in *Skrtich v. Thornton,* 267 F.3d 1251, 1261 (11th Cir. 2001), defendants sought to raise the qualified immunity defense for the first time in their third motion to dismiss, after having failed to raise the defense in their answer. *Guzman-Rivera v. Rivera-Cruz,* 98 F.3d 664, 667 (1st Cir. 1996), specifically approves the filing of a motion for summary judgment on qualified immunity at the conclusion of discovery. *Apostol v. Gallion,* 870 F.2d 1335, 1339 (7th Cir. 1989), concerns whether a defendant can involuntarily waive his right to an interlocutory <u>appeal</u> on the qualified immunity issue prior to trial by, *e.g.,* waiting too long after the denial of summary judgment. *Jones v. Wells,* 989 F.2d 493 (4th Cir. 1993), an unpublished decision, upheld the trial court's refusal to rule on a summary judgment motion where qualified immunity was raised for the first time in the party's pretrial conference document. *McElroy v. City of Macon,* 68 F.3d 437, 438 (11th Cir. 1995), involved the denial of a motion for summary judgment on qualified immunity where the defendant, after agreeing to a specific trial date, proceeded to file his motion only eleven days before trial despite a local rule providing that a party has twenty days to file an opposition to a civil motion. Finally, in *Rosario-Diaz v. Gonzalez,* 140 F.3d 312, 316 (1st Cir. 1998), the court affirmed the trial court's refusal to entertain motions raising the qualified immunity defense where they were filed, without permission or excuse, many weeks after the deadline set in the scheduling order for the filing of dispositive motions. Here, in contrast, defendants' motion was filed <u>on</u> the date set for the filing of dispositive motions.

parties submitted a joint scheduling order providing that the parties would conclude discovery by September 14 and that "all dispositive motions shall be filed no later than September 28, 2001" (emphasis added). If, as plaintiff suddenly now contends, defendant was required to have filed any motion raising qualified immunity no later than April 12th (30 days after the answer), then plaintiff should have noted this in the scheduling order (unless, of course, it was his intention all along to attempt to sandbag defendants).

In fact, when the scheduling order was proposed by the parties and signed by the Court, plaintiff was still pursuing an administrative remedy. In February 2001, a five member faculty panel convened to begin hearing testimony and receiving evidence with respect to Dr. Abdurrahman's detailed grievance challenging "the conditions of his employment relevant to his pursuit of promotion and tenure and the process and procedures employed when arriving at the decision not to promote." Exhibit A; Exhibit C at p. 3. On May 8, 2001, the panel issued a unanimous decision recommending that the decision not to promote plaintiff be upheld. Exhibit C.

In early June, defendants sought to schedule plaintiff's deposition, an obvious and necessary prerequisite to the preparation of an adequate motion for summary judgment on qualified immunity.[3] See Exhibit MM. Although plaintiff's counsel suggested some dates in July, the subsequent incapacity of defendants' counsel prevented defendants from deposing plaintiff at that time. In early July, defendants' former counsel, Maureen Franz, contracted a severe case of pneumonia, which necessitated her complete absence from work for nearly seven weeks. Thereafter, to prevent a relapse, for several additional weeks, her physician restricted her to

---

[3] The need for such a deposition is particularly true in this case, where the plaintiff's actual testimony has often clashed significantly with the factual assertions contained in his Court filings.

working only a few hours a day. Plaintiff's counsel was well aware of defense counsel's condition; on July 30, 2001, he even prepared and filed a joint motion to extend the discovery and dispositive motions deadline, citing counsel's illness as the justification. The Court granted this joint motion, which set October 29, 2001 as the new deadline for filing dispositive motions, in an order dated August 2, 2001.[4] Once again, there was no mention of a separate deadline for the filing of a motion raising qualified immunity.

At no time did plaintiff seek a ruling exempting motions concerning qualified immunity from the plain language of the Court ordered dispositive motion deadline, even though he was well aware that defendants intended to file such a motion.[5] Likewise, he did not seek an order to remove the restriction on the scope of discovery on the purported ground that defendants had failed to meet some hypothetical deadline for filing a motion on qualified immunity, even though he now claims that his interests were being prejudiced. He cannot now assert that defendants were not entitled to rely upon the plain language of the April 26 scheduling order, as amended by the order of July 30, setting October 29, 2001 as the deadline for filing "all dispositive motions."

Moreover, any suggestion of prejudice is disingenuous at best. First, no trial date has been set. Second, and more important, plaintiff's assertion that he was barred from discovery on issues other than qualified immunity is misleading with respect to the individual defendants and simply untrue as to defendant UT. Opposition at p. 7.

---

[4] Undersigned counsel became employed by the Attorney General's Office on September 4, 2001, was assigned this case shortly thereafter, and deposed plaintiff on September 24, 2001.

[5] Indeed, in his Memorandum in Opposition to Individual Defendants' Motion for a Rule 7 Reply (docket item 6) at p. 2, plaintiff declares: Although not required to anticipate the qualified immunity defense, he did so, as a practical matter, in this case."

With respect to the individual defendants, the qualified immunity issues effectively subsume both the First Amendment and the 42 U.S.C. § 1981 discrimination claims, the only claims under which plaintiff proceeds against them. As the objective reasonableness of defendants' actions is at issue, depositions to determine what those actions were in this case would certainly have been within the bounds set by the Court's discovery order. Plaintiff's choice not to depose these individuals, thus, most likely stemmed not from the Court's order limiting discovery, but from the reality that his present counsel already had the opportunity to see and cross examine key defendants J. Parker Lamb, Dr. Dale Klein, Dr. Sheldon Landsberger, and Dean Streetman at the grievance hearing (as well as key witness Graham Carey). His counsel likewise had the opportunity to contact Drs. Koen and Wehring, two nuclear engineering faculty members sympathetic to plaintiff, whom plaintiff called as witnesses at his hearing.[6]

Plaintiff's written discovery to defendant UT clearly covered the waterfront and was by no means limited to qualified immunity issues.[7] For example, his interrogatories (Exhibit PP) included, *inter alia*, a request for the identification of all persons having knowledge of the "relevant facts" (Interrogatory no. 4), information relevant to the calculation of backpay (Interrogatory nos. 9-11), and even the "reasonableness" of defense counsel's billing rate (Interrogatory 13), while the document production requests (Exhibit QQ) included all documents

---

[6] Both gentlemen testified, however, that plaintiff was not qualified for tenure.

[7] Plaintiff's written discovery to the individual defendants was largely objectionable, typically calling for legal conclusions from lay witnesses. See Exhibits NN, OO. Other objectionable matter included asking each defendant who had testified at the grievance hearing to admit that the testimony he gave "was the truth, the whole truth, and nothing but the truth" (e.g., see Exhibit NN at Request no. 3), and that "a reasonable attorney's fee for the services of David T. Lopez in this action is $350 an hour" (Id. at Request no. 10.).

related to plaintiff's alleged complaint(s) regarding the ANRC )(Request No. 1), all documents related to plaintiff's application for tenure or his competence (Request nos. 3, 14), and all documents "concerning the employment or tenure of plaintiff" authored by any of the individual defendants (except defendant Faulkner) (Request nos. 5, 8-12). Moreover, in recognition of the Court's directive in the April 26, 2001 scheduling order that the parties be ready for trial forty-five days after the dispositive motion deadline, defendant responded to these requests without making any objection to their being beyond the scope of the Court's March 22 order limiting discovery to the issue of qualified immunity.

There is, thus, no legitimate reason to suggest that the Court should not rule on all aspects of defendants' motion for summary judgment, including the individual defendants' entitlement to dismissal based upon qualified immunity.

## II.  Defendants Are Entitled To Summary Judgment As A Matter Of Law On Plaintiff's First Amendment Retaliation Claim

### A.  Plaintiff Never Spoke Out About the Issue of Routing Funds Through the ANRC

In his opposition, plaintiff avoids dealing with defendants' contention that the speech he did utter is not about a matter of public concern. That speech, it must be recalled, consists of nothing more than a single e-mail (Exhibit J), directed to a faculty member at Texas A&M and forwarded to various ANRC officials, which was prompted by plaintiff's belated realization that the budget for one of his projects had been cut two months previously.[8] See motion for summary

---

[8] Indeed, plaintiff's only comment about this speech in his Opposition is to note that Marvin Adams at Texas A&M remarked back in an e-mail to plaintiff that copying the ANRC powers was a "bold move." Opposition at p. 12. When plaintiff was questioned about this at his deposition, however, he made clear that he understood the "what can they do to you that's worse than what they've already done" remark to refer to the fact that, prior to his January 1997 e-mail, he was already in a difficult position as far as

judgment at 3-6, 13-16 and Exhibit J. It contains nothing suggestive of official misconduct, misbehavior, malfeasance, or any of the other sorts of behaviors described by the supplemental authority offered by plaintiff from our circuit in *Branton v. City of Dallas*, 2001 WL 1398532 (5th Cir. November 9, 2001) at *6.

Rather than defending the content of his solitary e-mail, however, plaintiff's opposition (at 12-13) pulls a "bait and switch," arguing instead the public interest content of speech contained in a letter sent by two faculty members of Texas A&M (Exhibit JJ). However, that letter, dated November 14, 1997, is signed by Drs. Marvin Adams and Paul Nelson of Texas A&M. Plaintiff's name appears nowhere on the letter.[9] Moreover, it is telling, indeed, that plaintiff's opposition to this motion contains no citation to any record evidence demonstrating that plaintiff ever publicly voiced the concerns expressed in the Adams-Nelson letter. In fact, he did not.

Both in his testimony at the grievance hearing and in his deposition, plaintiff made it abundantly clear that while he discussed the subject with the Texas A&M faculty, he did not complain publicly about the issue of routing third party funding through the ANRC; rather, it was the Texas A&M faculty who did so. As he explained at one point during the grievance hearing:

> . . . and the center, specifically Dr. Klein at that time had the view that whatever funding you will get, not me personally but myself and the people who were working with the center as well as the people at Texas A&M, too, that that funding should go though the center central account. That was not acceptable to the Texas A&M people. . . . these two objected to

---

finances were concerned because, "There were delays in the funding. We make commitments to students early on to start working on some projects and when the money is not there, that creates a lot of problems and a lot of tension. . . ." Ex. RR at 75-77. As noted in defendants' motion for summary judgment at p. 6, n. 7, plaintiff continued to receive new funding from the ANRC subsequent to his January 1997 e-mail.

[9] The substance of the letter and the "through the Center" issue is discussed in defendants' motion for summary judgment at 27-29 and the rationale for the policy is described therein at 27, n. 35.

that requirement and wrote a letter to the center saying we don't feel obliged; if we get other funding, you know, related to our expertise, that should go though the center.

Exhibit SS at 77-78 (emphasis added).[10]

Moments later, one of the grievance panel members expressed confusion regarding the Nelson-Adams letter (Exhibit JJ) and its relationship to plaintiff's retaliation complaint and, with the help of his counsel, plaintiff clarified as follows:

Ms. Reichl:     And you signed that letter [Nelson-Adams] also?

The Witness:   No, I didn't sign that letter, but I was on that – on the project . . . that had the award.   Now, the same scenario was repeated with me later on.

Q:     (by Mr. Lopez) Let me – let me – we are, I think, at December of 1997.   Right after that, say in the period of January '97 – or I guess it would be January '98 did you send out some communications that generally dealt with the same subject and supported the A&M people?

A:     The communication that I sent was not related to this particular issue

Q:     Okay

A      It was related to the delays in dispensing the funds, because we as faculty and as investigators had to make commitments, had to recruit students to work on those projects and had to make clear to them that we have the funds and so on.

Exhibit SS at 81 (emphasis added).

---

[10] Dr. Abdurrahman's own views were far milder.   When asked at his deposition about the "through the center" policy as applied to a grant plaintiff received from the Oak Ridge National Laboratory (a DOE facility), plaintiff responded as follows:

Q: And you indicated in the part that I read that you had no problem with the funding going through the center as long as it is done in a timely fashion?

A:     Yes.
Q:     Was that true?
A:     Yes.   I had some reservations and some concerns, but eventually I thought it was okay.
Exhibit RR at 27-28.

Towards the end of her cross examination of plaintiff at the grievance hearing, the UT

System attorney gave Dr. Abdurrahman yet another opportunity to explain the source of his belief

that Dr. Klein had a motive to be displeased with him regarding his "activities at the Amarillo

National Resource Center":

> Q:    Okay, Now, let me understand, I think, your complaint or your statement in terms
> of why you thought Dr. Klein was displeased with you with regard to your
> activities at the Amarillo National Resource Center.
>
> I understand that what you are saying is that you had complained about – and sent
> an e-mail complaining about a delay in obtaining funding?
>
> A:    Uh-huh. That was the initial thing that triggered this, yes.
>
> Q:    And what other things did you claim that you complained about?  Was there
> anything else aside from this?
>
> A:    Actually that was the main thing. After that my tensions with Sheldon and so on
> were always propagated to Dr. Klein and he was basically given information about
> me.
>
> Q:    But you – but you believe it was all based because you had complained about the
> delay in getting funding.
>
> A:    It was based about criticizing the center and the operation of the center in that
> public manner.
>
> Q:    And that public manner, was that one e-mail?
>
> A:    That was one e-mail (sic).

Exhibit SS at 163-64 (emphasis added).

Finally, at his deposition plaintiff again acknowledged that apart from private e-mail

discussions of the matter between himself and co-researchers Adams and Nelson, he had not

complained publicly about the "through the Center" issue:

-10-

Q: Okay. Did you write any other e-mails or any other communication – written communication of any kind complaining about the center other than this e-mail [Exhibit J] we've just been talking about ?

A: We exchanged e-mails and discussions on the – the other issue, which is the funding has to go through the center and so on.

Q: But you never sent any e-mails on that subject to Dr. Klein or to the powers that be at the ANRCP, correct?

A: No.

Q: All right. And the gist of your complaint is as stated in this e-mail [Exhibit J]?

A: yes.

Exhibit RR at 73.

### B. There Is No Evidence That Plaintiff's Speech Was A Motivating Factor In The Denial Of Tenure

Defendants have offered uncontroverted evidence that none of the individuals who voted

on the tenure decision was aware of plaintiff's e-mail regarding the ANRC. See Motion for

Summary Judgment at n. 26. The only UT faculty member who was copied on the e-mail was Dr.

Klein, and he did not vote on plaintiff's tenure and has testified that he did not advise anyone else

how to vote. Exhibit B at 284. This is fatal to plaintiff's First Amendment retaliation claim.

Moreover there is a gap of nearly two years between the January 30, 1997 e-mail and the tenure

denial in December 1998. Thus a retaliatory motive on the part of any of the individual

defendants is presumed to be "highly unlikely." *Mato v. Baldauf*, 267 F.3d 444, 453 (5th Cir.

2001).[11]

---

[11] In his opposition at p. 15-16, plaintiff seizes on the only documented instance in which Dr. Klein ever expressed anger towards plaintiff. The episode occurred in August 1998, and involved plaintiff's refusal to use his own university account to pay an employee. This incident is discussed in defendants' moving brief at 26-27 and n. 34, is not material, and affords no basis for denying summary

Recognizing the lack of any causal link between his e-mail and the denial of tenure -- the only timely and legally sufficient adverse action plaintiff has suffered -- plaintiff makes the remarkable assertion that:

> in the same month as his original e-mail, January, 1997, Dr. Abdurrahman was removed from the position of area coordinator of the nuclear program at The University of Texas, a position he had held since joining the faculty . . . . [h]e was replaced by Defendant Sheldon Landsberger.

Opposition at 13-14. This statement is untrue in two respects: First, plaintiff never held the title of "area coordinator."[12] Second, after months of negotiations, Dr. Landsberger was officially

---

judgment, even as to defendant Klein, for two reasons. First, Dr. Klein did not vote on plaintiff's tenure, so even assuming *arguendo* he were hostile toward plaintiff for an improper reason, there is still no causation between his hostility and plaintiff's tenure denial. Second, as evident by the date, the event occurred over eighteen months after the supposedly hostility generating e-mail, thus any retaliatory motive is presumed unlikely. *Mato, supra*.

Moreover, although an explanation for Dr. Klein's remark is not required due to reasons one and two above, it may be helpful to appreciate that plaintiff's behavior in the matter can only be characterized as provocative and obnoxious, and more than sufficient to justify Dr. Klein's ultimate loss of patience. Plaintiff has testified that sometime in 1997, after a performance review of the NETL, "all budgetary matters that were related to the Nuclear Engineering Teaching Lab were taken over by Dr. Klein" although Dr. Wehring continue on as Director of the NETL. (Exhibit SS at 157). Knowing that Dr. Klein was in charge of the NETL funds, in 1998 plaintiff nevertheless persisted in demanding that the NETL provide funds to pay a postdoc working exclusively for plaintiff, sending e-mail after e-mail to Dr. Klein, despite having been told repeatedly by vice chancellor Klein that NETL funds could not be used for that purpose and that plaintiff should instead use funds the university had given him in 1993 that were left over from plaintiff's university "start-up" account. See Exhibit II.

At one point in the exchange, plaintiff even highlighted the tension between Dr. Klein and Dr. Wehring (and doubtless embarrassed Dr. Wehring), by copying Dr. Klein on an e-mail addressed to Dr. Wehring by his official title, Director, NETL, which began "I have not been able to come to an agreement with Dr. Klein . . . " Such disrespectful behavior by an untenured junior faculty member toward a senior university official is hard to fathom, but certainly illustrates plaintiff's unwillingness to take direction from anyone in authority about anything.

[12] Dr. Lamb, chairman of the Mechanical Engineering Department, of which Nuclear Engineering is a program area, testified at the grievance hearing that Dr. Wehring was hired to be both the director of the Nuclear Engineering Teaching Laboratory and the area coordinator for nuclear engineering. Exhibit B at 521-22. Moreover, Dr. Wehring used this title. See Exhibit TT.

hired in December 1996, and his appointment letter is dated December 18, 1996, or six weeks

before plaintiff forwarded his e-mail to Dr. Klein. That letter clearly states that Dr. Landsberger's

new duties include, "providing administrative leadership as Area Coordinator of our Nuclear

Engineering Program." Exhibit K, p. 1. Thus the hiring of Dr. Landsberger as area coordinator

manifestly had nothing to do with plaintiff's e-mail.

Finally, plaintiff's repetition of his litany of the supposed adverse actions following his e-

mail to the ANRC, regarding office assignments at the NETL, questions about his accounts,

"interference" with his graduate students, and the like, fails to respond to two fatal flaws raised in

defendants' motion. First, none of these actions constitutes an "adverse" action within the

meaning of the law. *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995). Second, all of these

actions fall outside the applicable two year statute of limitations for claims arising under 42

U.S.C. § 1983 except the tenure denial. Thus, even taking all of plaintiff's allegations as true,

they are of no legal significance, and the only issue is whether he was wrongfully denied tenure

based upon his speech. As none of the faculty who voted on tenure was aware of plaintiff's

speech, defendants are entitled to summary judgment on this issue as a matter of law.

---

Dr. Abdurrahman's actual testimony on this point is that he was the "de facto" area coordinator. As he explains, "I was the de facto area – area coordinator. I was not actually not officially named as such, but I was carrying the duties of the area coordinator at that time. Dr. Wehring was mainly taking care of the reactor and the lab, so I did all the class scheduling, the TA assignments, the recruiting . . . " Exhibit SS at 76. He further explains, "There was not real designation. It was Nolan Hertel who did that coordination before he left, and when I came, I sort of took over without actually discussing that position officially." Exhibit SS at 149. Taking plaintiff's testimony as true, it would appear that Dr. Wehring allowed plaintiff to assume various coordination functions, but there is no dispute that plaintiff did not have the title. If anything, this merely corroborates Dr. Lamb's assessment that a senior faculty member other than Dr. Wehring needed to be brought in to run the foundering nuclear engineering program, and helps explain the decision to hire Dr. Landsberger.

**C.    All Of The Individual Defendants Are Entitled To Qualified Immunity With Respect To Plaintiff's First Amendment Claim**

As discussed at length in defendants' moving brief, plaintiff's e-mail "speech" was not on a matter of public concern. Moreover, defendants have introduced sworn statements from defendants Faulkner, Armstrong, Eckland-Olson, and Streetman that they were not aware of plaintiff's "criticism" of the ANRC. Exhibits DD, EE, FF, GG. Defendant Lamb testified at the grievance hearing, under oath, that he "Kn[e]w nothing about" plaintiff's supposed ANRC complaint. Exhibit B at 558. Dr. Klein testified that he did not vote on plaintiff's tenure or tell anyone else how to vote. Exhibit B at 284. Dr. Landsberger was still living in Illinois in January 1997 and did not even relocate to the UT campus until the summer of 1997.

Plaintiff, in contrast, has offered no evidence that any defendant but Klein, who was copied on the e-mail, was aware of plaintiff's "speech" and no evidence that any defendant was motivated to retaliate against plaintiff on account of said speech. Since no one but Klein even knew of the "speech" (and Klein did not participate in the final decision), even if the speech were protected, none of the individual defendants can be found to have violated clearly established First Amendment rights of which a reasonable person would have known. Indeed, plaintiff has failed to make even a threshold showing that his speech was a motivating factor in the tenure denial.

Furthermore, in explaining how the law prevents allegations of "unconstitutional motive" from carrying a plaintiff to trial in the face of a claim for qualified immunity, the Supreme Court noted in *Crawford-El v. Britton*, 523 U.S. 574, 592-93 (1998) (emphasis added):

> Second, at least with certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation – <u>there must also be evidence of</u>

causation. Accordingly, when a public employee shows that protected speech was a 'motivating factor' in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct ....

In this case, however, there is no genuine issue of material fact as to whether plaintiff was qualified for tenure. Plaintiff called two of the four UT nuclear engineering faculty, Drs. Wehring and Koen, as his witnesses at the grievance hearing. They testified that plaintiff was not qualified to receive tenure at UT.[13] The University called the remaining nuclear engineering faculty, Drs. Klein and Landsberger. They testified at length as to the reasons why plaintiff was not qualified for tenure. Dr. Lamb, chairman of the Mechanical Engineering department, within which nuclear engineering is a program, testified that plaintiff was not qualified for tenure. At the next level up in the tenure process Graham Carey, a faculty member on the six member Dean's Committee who was tasked with reviewing plaintiff's tenure dossier and reporting to the rest of the committee, testified that based upon his independent review of the tenure file, plaintiff was not qualified for tenure. Ben Streetman, Dean of the UT College of Engineering, testified that based upon his review, plaintiff was not qualified for tenure. In short, there is not a single faculty witness plaintiff can call who will be able to testify that plaintiff was qualified for tenure. Under these

---

[13] Plaintiff's attempt to make a cause celebre out of remarks by Dr. Wehring at the grievance hearing that Drs. Klein and Landsberger were opposed to plaintiff's receipt of tenure is to no avail. See Opposition at p. 18. During his testimony, Dr. Wehring acknowledged that he had voted "no" on tenure even though it was a secret ballot, that in comparison to other candidates being considered for tenure within the Mechanical Engineering Department at UT plaintiff's tenure file was simply not strong enough, that Dr. Wehring was concerned that plaintiff's tenure file lacked an independent full length paper published by a peer review journal, and that he himself had talked to plaintiff about the need to publish an independent full-length article. Exhibit B at 107-111. Thus, he clearly would have voted "no" regardless of what he believed anyone else thought. In any event, it must be recalled that the full professors within Mechanical Engineering (sitting as the "Budget Council") voted 24:4 against tenure for plaintiff, so even a change of Dr. Wehring's vote would not have changed the outcome. Exhibit AA.

circumstances, a jury verdict to the contrary would lack a legally sufficient evidentiary basis and would ultimately be overturned.

Indeed, plaintiff has no legitimate argument he can make regarding his qualifications.[14] He can point to no other successful tenure candidate who was consistently rated among the worst three faculty members in the Mechanical Engineering Department by graduating seniors. He can point to no other tenure candidate who failed to produce any full length journal articles in peer reviewed journals but nonetheless was awarded tenure based upon a record comprising exclusively the publication of 900 word (1-2 page) summaries in the TANS during the entirety of his five year probationary period. There is no such individual.

Although plaintiff tries to create a triable issue by asserting that there were departures from "past practice," in fact there has been no departure from past practice regarding tenure. All plaintiff has shown is that some tenured faculty members, such as Dr. Wehring, also published in the TANS, and that faculty summaries appearing in the TANS were included in ME annual reports of faculty publications under the heading of peer reviewed publications. Taking these

---

[14] Lacking a significant argument, he resorts to nitpicking. For example, he suggests that the Statement of the Department Chair (Exhibit BB) is somehow internally inconsistent and that its statement that "a review of recent exit surveys by our BS recipients indicated that his name appears regularly as one of the three "worst" teachers they had encountered in Mechanical Engineering" is hearsay. First, the document is a business record. Second, as plaintiff is well aware, Dr. Lamb, testified at the grievance hearing about the Deans' office practice of collecting an exit survey each semester from graduating engineering seniors, and of his own practice, upon receiving copies, of compiling a list of those who received "at least one citation from the exit survey of being best and those who had the worst . . ." and that "One of the things I discovered was that Abdurrahman's name was near the top of every semester in the worst." Exhibit SS at 559-61. Finally, this assessment of plaintiff's poor teaching ability was consistent over time. See Exhibit Q, a June 1997 memo to plaintiff from Dr. Lamb, in which Dr. Lamb advises, "your teaching record has been below that of our recent candidates for promotion," and advises that plaintiff's chances of making tenure as of that date are "50:50 at best."

facts as true, this evidence is legally insufficient to prove that plaintiff was subjected to different standards for <u>tenure</u> than were others. All of the UT nuclear engineering faculty have testified that summary articles in the TANS should be accorded "some" weight, but cannot serve as the exclusive means of publication. They have likewise all testified that full length peer reviewed journal articles are required for tenure. Plaintiff published none during his years at UT. He has likewise admitted that Area Coordinator Landsberger began telling him, several years before he was up for tenure, that he would need to write and publish full length articles in order to be successful in his quest for tenure. Thus, he cannot say that he "met the expectations of The University as communicated to him." Opposition at 17.

### III. There Are No Material Facts In Dispute With Respect To Plaintiff's Discrimination Claim And Defendants Are Entitled To Summary Judgment

#### A. There Is No Evidence Of Racial Discrimination

Plaintiff has failed to introduce any evidence that his denial of tenure was due to discrimination rather than his lackluster academic credentials. He has not testified (and cannot) that he ever heard any defendant make a racially derogatory remark, nor has he introduced the sworn statement of any other individual claiming to have done so. Although he asserts that defendants "participated in denying him promotion and tenure applying criteria differently from that applied to other faculty" (Opposition at p. 20), plaintiff misstates the issue. The issue is how he was treated compared to other candidates for <u>tenure</u>. As discussed in section IIC above, however, there is no similarly situated non-Arab who was nonetheless granted tenure despite publishing only 1-2 page summary articles, and there is likewise no similarly situated nonArab who was granted tenure despite having a similar publication record and consistently low teaching

scores like those received by plaintiff. Indeed, in discovery defendants provided plaintiff with the curriculum vitaes of those who were up for tenure within the Mechanical Engineering department the same year that he was, but in his opposition he has not presented any comparisons.

He admits that Area Coordinator Landsberger advised him repeatedly regarding the need to publish full length journal articles in publications other than the TANS commencing "from before [Landsberger] came to UT " in 1997. Exhibit H at 117-19. He admits that he attended meetings with other assistant professors at which the junior faculty were given advice regarding the need to publish significant articles in peer reviewed journals. Exhibit H at 119-20.[15] He simply did not do so.

Plaintiff complains about the process used to select outside references. He does not deny that the individuals who were asked to review his resume and publications were from the top schools in the nuclear engineering field, however. Likewise, he cannot dispute that the references received from individuals selected from plaintiff's own list (Exhibit W) were, with one exception, dismal. See Exhibit Y.

In short, there simply is no dispute regarding any material facts with respect to plaintiff's qualifications for tenure. His publications, teaching, and references were subpart, and he has not

---

[15] Apparently, plaintiff is of the view that he was free to ignore anything that Area Coordinator Landsberger told him in 1997 or thereafter, because the TANS was "listed as a premier journal for faculty research publications in the Department of Engineering." Opposition at 18. This list, which plaintiff has not introduced, contains close to one hundred publications and was, according to plaintiff, drawn up in 1994 or 1995, when Dr. Lamb's predecessor was the chairman of ME. Opposition at Exhibit 6, p. 94. The list does not attempt to rank the journals that appear on it, and the existence of the TANS on the list in no way contradicts the testimony of Dr. Wehring and others that the TANS was not among the top three journals in the field of nuclear engineering. Exhibit SS at 116. Moreover, the appearance of the TANS on a lengthy, dated, list, the limited purpose of which was fully explained by Dr. Lamb at the grievance hearing, does not create a triable issue over whether publishing, exclusively, very short summaries in one journal on the list would be acceptable for tenure. Exhibit SS at 539-40.

compared himself with any other successful tenure candidate despite having the resources to do so. He has demonstrated no deviations from "past practice" with respect to the granting of tenure.

### B. Defendants Are Entitled To Qualified Immunity As To Plaintiff's Discrimination Claims

Although he has no overt evidence of discrimination, plaintiff nevertheless asserts his belief that the individual defendants, and, in particular, defendant Landsberger, harbored discriminatory feelings towards him because he is an Arab. While defendants vehemently deny having discriminated against plaintiff on account of his race, for qualified immunity purposes their subjective beliefs are irrelevant. As the Fifth Circuit has explained, "a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity." *Thompson v. Upshur County, TX*, 245 F.3d 447, 457 (5th Cir. 2001). Moreover, the actions of officials must be held "objectively reasonable" unless "*all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." Id. (emphasis in original). As discussed at length in defendants moving brief (pp. 25-40), stripped of their supposedly racial motive, each of the seven individual defendants' actions was objectively reasonable, and all are entitled to dismissal based upon qualified immunity.

### IV. There Is No Evidence To Support Plaintiff's Newly Minted Title VI Claim

Yet again plaintiff's ever changing Title VI claim has put on new raiment. While his complaint merely asserted a bare violation of Title VI "on the basis of acts of defendants," in his response to defendants' motion to dismiss, it sounded like plaintiff was suggesting that his (e-

mail) complaint about the ANRC was somehow related to a protest against racial discrimination by that entity. Defendants having thoroughly explored the implausibility of reading anything remotely racial into plaintiff's e-mail to the ANRC, plaintiff now asserts, for the first time, that "[t]here is evidence that Dr. Abdurrahman voiced concerns about the treatment of Arab students to the defendants who were most closely connected with his failure to be promoted and tenured." Opposition at 22. Presumably this would have been a good time for plaintiff to present such evidence if he had any.[16]

Plaintiff's attempt to contort his adverse interaction with Dr. Klein about plaintiff's failure to pay his own postdoctoral assistant into a Title VI issue due to the race of the assistant is worthy of Procrustes. That event, discussed *supra* at 11-12, n. 11, involved Dr. Klein's ire that plaintiff had failed to pay his own employee and was seeking NETL funds to do so. As Dr. Klein explained in his e-mail of August 26th, "In my view, this is an emergency and is an appropriate use of these start-up funds. It is inappropriate not to pay Musa and your start-up funds should be used for this purpose BEFORE asking for NETL funds to pay for Musa's salary." (Exhibit II,

---

[16] Exhibit 9 to Plaintiff's Opposition, if intended as such evidence, will not suffice. It should be recalled that Mohammed Elsawi, the subject of exhibit 9, was the graduate student assigned to plaintiff, discussed in defendants' moving brief at p. 33 and n. 40, who became so disgruntled that he applied to transfer to Northwestern University and actually accepted a graduate student appointment there. See Exhibit LL. Mr. Elsawi told professor Koen of his impending departure. Professor Koen told Dr. Landsberger, and Dr. Landsberger attempted to convince Elsawi to stay, including offering to allow him to switch thesis advisers.

Apart from the fact that Dr. Landsberger behaved entirely appropriately given his role as Area Coordinator and his desire not to lose "such a good student" (pltf's exhibit 9 at p. 2), there is nothing in exhibit 9 indicating that plaintiff "opposed" discriminatory practices violative of Title VI. His complaint was that Dr. Landsberger had offered to allow Elsawi to work with another advisor if he chose to remain at UT, not that Elsawi had been disadvantaged in any way. See Exhibit 9 at p. 3 ("You know very well that Mohamed is my student. I have recruited him and supported him for the last three years. He successfully completed his course work and passed his qualifying exam. It's totally unethical, unprofessional, and unprecedented for another faculty to interfere between a student and his advisor . . .").

underscore emphasis added). As is evident, Dr. Klein displayed no ill motive towards Dr. Musa Yavuz – on the contrary, he wanted him paid.

Plaintiff also trots out rank hearsay, citing plaintiff's own deposition testimony for the proposition that one of his graduate students "was of the opinion" that Dr. Landsberger disliked Arabs and Muslims. [17] Opposition at p. 21. Regardless of the rationality of this student's beliefs, to support a claim under Title VI, there would need to be evidence that plaintiff objected that this student was being mistreated due to his race. In fact, plaintiff has introduced no evidence that plaintiff objected about this student's treatment to anyone, including Dr. Landsberger, much less that if he did so, he suggested that the allegedly unfair treatment was due to race.[18]

## CONCLUSION

This is an appropriate case for resolution on motion. There are no genuine issues in dispute, only repeated efforts by plaintiff to distort events that, even taken as true, would not rise to the level of adverse actions and would, in any event be time barred. Plaintiff has failed to produce evidence with respect to crucial components of his First Amendment and § 1981 claims, and has likewise failed to defeat defendants' entitlement to qualified immunity by showing that any of the defendants has acted in an objectively unreasonable manner. Indeed, he has not even made out a prima facie case that he was qualified for tenure. Finally, defendants and the Court

---

[17] Curiously, this same former graduate student testified for plaintiff at the grievance hearing, only there, under oath, he stated, "Actually I got the impression from this reply and from other things that [Dr. Landsberger] – he kind of not like or kind of discrimination because I was an international student. I don't know if it's basically because I'm from Egypt or just general international student." Exhibit SS at 617.

[18] Dr. Lamb testified at the grievance hearing that this student "wasn't making progress on his doctoral dissertation" in part because although plaintiff had the research funds to hire him so that he could work full time on his thesis, he had not done so and the student was working part time at the computer lab, thus progress on his dissertation was slow. Exhibit SS at 583.

have waited long enough for plaintiff to articulate and offer evidence in support of a Title VI claim, and he has still not done so. Defendants therefore urge the Court to grant their motion for summary judgment.

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

JEFFREY S. BOYD
Deputy Attorney General for Litigation

TONI HUNTER
Chief, General Litigation Division

LINDA A. HALPERN
Texas Bar No. 24030166
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
(512) 320-0667 FAX
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Reply to Plaintiff's

Opposition to Defendants' Motion for Summary Judgment  has been sent via certified mail, return

receipt requested on _26th_ day of November, 2001  to:


       David T. Lopez
       David T. Lopez & Assoc.
       3900 Montrose Boulevard
       Houston, Texas 77006-4959


                           LINDA A. HALPERN
                           Assistant Attorney General

NAEEM M. ABDURRAHMAN,  §
    *Plaintiff,*  §
      §
      §
*v.*  §
      §
THE UNIVERSITY OF TEXAS,  §
DALE E. KLEIN,  §    CIVIL ACTION NO. A 00 CA 813 JN
LARRY R. FAULKNER,  §
SHELDON EKLAND-OLSON,  §
BEN G. STREETMAN,  §
NEAL E. ARMSTRONG,  §
SHELDON LANDSBERGER and  §
J. PARKER LAMB,  §
    *Defendants.*  §

## <u>DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

### APPENDIX

MM -   Letter, dated June 5, 2001, from Darlene Morgan to David Lopez

NN -   Defendant Dale E. Klein's Responses to Plaintiff's First Request for Admissions

OO -   Defendant Dale E. Klein's Answers to Plaintiff's Interrogatories

PP -   Defendant University of Texas' Answers to Plaintiff's Interrogatories.

QQ -   Defendant University of Texas' Responses to Plaintiff's Requests for Production

RR -   Deposition of Naeem Abdurrahman

SS -   Transcript of the Grievance Hearing

TT -   Memorandum from Bernard Wehring, Area Coordinator, to Gary C. Vliet, Area Coordinator

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

## NOTICE OF DOCUMENT(S) NOT IMAGED

Civil Case No.     A-00-CA-813 JN

NAEEM M. ABDURRAHMAN

VS.

UNIVERSITY OF TEXAS, et al

Attachments to
Document #:     43

Description:     Attachments to Defendants' Reply to
Plaintiff's Opposition to Defendants'
Motion for Summary Judgment

Filed By:     All Defendants

File Date:     11/26/01

_____
DEPUTY CLERK